346 So.2d 769 (1977)
LAFOURCHE PARISH WATER DISTRICT NO. 1
v.
CARL HECK ENGINEERS, INC.
No. 11309.
Court of Appeal of Louisiana, First Circuit.
May 9, 1977.
*772 Randolph H. Parro, Block, Block & Parro, Thibodaux, for plaintiff and appellant.
Philip J. McMahon, and Jerry H. Schwab, Houma, for defendant and appellee.
Before LANDRY, EDWARDS and COLE, JJ.
COLE, Judge.
The plaintiff-appellant, Lafourche Parish Water District No. 1, filed a suit for a declaratory judgment against the defendant-appellee, Carl Heck Engineers, Inc., seeking to have a contract with the defendant declared null and void. In the alternative, the plaintiff sought to have the contract declared non-exclusive. The plaintiff appeals the judgment of the trial court which upheld the validity of the contract and also found the contract to be exclusive.
Various enumerated grounds were urged by the plaintiff to support its position that the contract was invalid. Each ground alleged was individually discussed and disposed of by the trial court, as was the alternative contention that the contract was non-exclusive, in its meticulously written reasons quoted in substantial part below:
"It might be well to set out here a brief summary of the events leading to the filing of this suit. The Lafourche Parish Water District Number One is governed by an eleven man Board of Commissioners, as authorized by the provisions of R.S. 33:3812(C). On July 7th, 1975, at a special meeting this Board, by a vote of six (6) to five (5), authorized the signing of a contract with defendant, Carl Heck Engineers, Inc., wherein defendant would provide the necessary professional engineering services in connection with the planning, design, and construction of all public improvements required by plaintiff and specifically authorized by plaintiff. The contract was for a term of five (5) years from date and would be deemed renewed on a year to year basis unless either party elected to terminate the renewed contract by giving written notice to the other party three (3) months prior to the expiration date of the current contract period.
"Apparently the Lafourche Parish Police Jury, the governing authority which appointed *773 the Board of Commissioners, was unhappy with this action of the Board for it expressed its displeasure almost immediately on July 9, 1975, removed Commissioner Terry Ordoyne, one of the six who voted for the contract and replaced him with a member of the Police Jury, W. H. `Bill' Trosclair. On July 12, 1975, the Water District Board was again convened and at this meeting the former minority, now the majority, passed a resolution of the Board by a six (6) to five (5) vote to seek the cancellation of the contract with defendant which had been authorized and accepted on July 7, 1975.
"The case for the plaintiff was presented over a two day period and when the plaintiff rested, the defendant rested without calling any witnesses. Inasmuch as the defendant had exercised its option to conduct a direct examination of two witnesses called by plaintiff under cross-examination, the Court permitted rebuttal testimony to be presented in connection with the direct examination defendant had made of these two witnesses. The matter was submitted to the Court on briefs, and at the suggestion of the Court the briefs were segmented so that each allegation of nullity would be treated separately, and since that method made for greater clarity in reviewing the respective arguments and the authorities cited by counsel, the Court will adopt the same procedure in presenting these written Reasons for Judgment.
"1. THE MOTION AUTHORIZING THE PRESIDENT OF THE WATER DISTRICT TO SIGN THE CONTRACT WAS INVALID, SINCE IT WAS IMPROPERLY PRESENTED AT A SPECIAL MEETING WHEREIN THE CALL FOR THE MEETING DID NOT REASONABLY NOTIFY THE COMMISSIONERS THAT THIS CONTRACT WOULD BE BROUGHT UP FOR A VOTE.
"There is no question concerning the fact that the meeting of July 7, 1975, was a special meeting. It is also true that the Call for the meeting sent out over the President's signature on July 2, 1975, did not specifically list as one of the purposes of the meeting that the Heck contract would be brought to the floor for a vote. Four matters were listed in this Call, the fourth of which was `4. Any other business to legally come before the Board.'
"It is plaintiff's contention that while there are no specific statutory provisions relating to the call of special meetings of water districts, a jurisprudential rule has evolved that action taken at special meetings is null and void if general corporate provisions are not followed. Many cases are cited both from Louisiana and from other jurisdictions in support of this position. Admitting that there are no cases precisely in point, plaintiff cites R.S. 12:73(D) requiring the notice of shareholders' meeting to state `purpose' of meeting and that it must be given at least ten days prior to meeting, but if this statutory provision can be extended to meetings of water district boards, we cannot take this one section out of context but should consider the entire subsection referred to. Further in R.S. 12:73(D) we find `. . . and such shall be deemed to have been given to, or waived by, all shareholders present or represented at any such meeting, except any shareholder who, at the beginning of the meeting, objects to the transaction of any business because the meeting is not lawfully called or convened. . ..'
"It would appear, therefore, that even if the notice required to be sent for shareholders' meetings applied to meetings of the Water District Board of Commissioners, the lack of proper notice (if the notice which issued was deficient) was waived since no one objected to voting when the vote was called or to holding the meeting because of lack of proper notice.
"Cases cited by plaintiff, Jones v. Shreveport Lodge No. 122, [221 La. 968], 60 So.2d 889 [1952]; Blum v. Latter, 163 So.2d 189 [La.App. 4th Cir. 1964]; and Phillips v. Newland, 166 So.2d 357 [La.App. 3rd Cir. 1964], which were cited in support of plaintiff's argument that the Louisiana cases have generally held that action taken at *774 special meetings is null and void if general corporate provisions are not followed, can be distinguished. The charters of these private corporations were silent as to requirements for calling special meetings of stockholders so the court applied general corporate provisions, but Exhibit D-4, filed in evidence in this suit, the By-Laws of the Water District, provided for the calling of special meetings and did not require that the purpose be stated. Further, as the Court recalls the testimony, the Board members testified that this was not the first occasion on which matters not specifically set out in a Call were discussed or voted on at a special meeting. The specific language of the By-Laws of the Water District regarding its provision for special meetings is found in Section 3 of Article 2, and it states:
"Special meetings of the board may be called by the President, Vice-President, or Secretary-Treasurer on three days notice either personal or written by mail or telegram to each member; however, notice may be waived by a two-thirds vote of the whole board. Special meetings shall be called by the President or Secretary in like manner and on like notice of the written request of two board members.'
It would appear that the Board, in formulating its By-Laws did not feel that there was a necessity to state the precise purpose of the Call of a special meeting. As a matter of fact, the special meeting could have been called verbally, making it impossible to tell whether or not any specific purposes were included since the By-Laws provided that the notice could be `either personal or written.' Additionally, notice could be waived. So obviously the inclusion of a `purpose' in the Call was not considered sacramental to the writers of the By-Laws. Apparently, insofar as the Water District was concerned, the requirement for notice to be given was to assure the attendance of the members rather than to apprise them in advance of the purpose. Since all eleven members of the Board attended the meeting of July 7, 1975, at which the President was authorized to sign the engineering contract, there was no omission in the Call which would taint the validity of the Board's action because the `purpose' of the meeting was not completely set out in detail in the notice of this special meeting. The principle of stating the purposes is admirable, but it is not required by the By-Laws of this particular corporate body.
"Accordingly, the Court cannot rule that the lack of specificity in the Call made the approval of the contract invalid.
"2. THE CONTRACT VOTED ON WAS NOT PRESENT AT THE MEETING AND COULD NOT BE PROPERLY REVIEWED, DEBATED, AND DISCUSSED; AND SINCE NUMEROUS DRAFTS OF THE CONTRACT HAD BEEN PROPOSED BY HECK, THE ACTION TAKEN BY THE COMMISSIONERS WAS INVALID AS CONTRARY TO PUBLIC POLICY BECAUSE THE VOTE TAKEN WAS WITHOUT ADEQUATE CARE AND CAUTION IN DISREGARD OF THEIR TRUST OBLIGATION TO THE PUBLIC. (Emphasis supplied by the Court)
"Before discussing this point, a question arose in the memoranda filed by counsel as to the inclusion of the underlined section in this allegation. It was omitted from plaintiff's brief and included in defendant's. The allegation as quoted above is as it appears in the original petition. Plaintiff claimed in its rebuttal brief that it had been agreed at the pretrial conference that the underlined section could be deleted without the necessity of an amendment of plaintiff's petition. Plaintiff admitted that after the filing of the petition counsel realized that `numerous drafts of the contract had not been proposed by Heck,' but the supplemental pretrial agreement, signed by all counsel and the Court and filed in the record, does not reflect this fact. Additionally, the Court does not recall such an agreement having been reached. However, whether the underlined phrase is omitted or included it has no material bearing on the crux of this allegation. The issue here seems to be *775 that the Court is asked to declare the contract void because there was inadequate debate and discussion of the contract prior to the vote at the meeting of July 7, 1975.
"The testimony of the Commissioners at the trial indicates that a copy of the contract was not presented for review at the meeting before the vote was taken. It is equally clear, however, that the meeting was held at the domicile of the District and that there was a copy present in its official files. The verbatim transcript of the meeting, which was filed in evidence, indicates to the Court that apparently none of the Commissioners requested to see a copy of the contract nor were any so unfamiliar with it that they expressed a `need' to see the contract before casting their vote.
"It is undisputed that several months before this special meeting the President of the Board mailed to each Commissioner a copy of the proposed contract and each Commissioner was specifically requested to study it and direct to the President's attention in writing any comments, pro and con, on the contract. The record also indicates that the only Commissioners who responded to the President's request after receiving their copy of the contract were the five Commissioners who with the President made the majority vote of six, which approved the contract at the July meeting. The five Commissioners who opposed the signing of the contract and who with the new commissioner now constitute the majority responsible for authorizing this suit, did not state their opinion of the contract in writing as requested.
"Additionally, a review of the Minutes of previous meetings and correspondence exchanged between the Water District and the Police Jury and the Water District and the District Attorney's Office indicates that the acceptance of the Heck contract was a subject of prime concern to the Commissioners from at least March, 1975, until it was approved and signed in July. The testimony of the Commissioners on the trial of this matter clearly indicated to the Court that all Commissioners were thoroughly familiar with the contents of the contract and the Court would surmise that this explains why no one bothered to ask for a specific review of the contract point by point at the July 7th meeting.
"The Court concludes, therefore, that there had been ample study made and it is evident that the lines were clearly drawn before the July 7th meeting. The votes as cast were obviously of no surprise to anyone present at that meeting. The request for the Court to sustain this allegation of nullity is actually asking the Court to substitute its judgment for the judgment of the majority of the Board of Commissioners on July 7, 1975, and this the Court has no authority to do. There is nothing in the record to indicate that by its vote the Board `abused its discretionary powers' in authorizing the President to execute this contract. As correctly stated by defendant, citing McCann v. [Mayor and Councilmen of] Morgan City, [173 La. 1063], 139 So. 481 [1932], if a public body acts without fraud being shown, without invading private rights, without manifest oppression, without gross abuse of power, its action is not subject to judicial control. The Court's review of the evidence introduced concerning the period preceding the vote on July 7th does not indicate that the action was taken in such a cavalier fashion that it should be considered a flagrant abuse of its delegated authority.
"3. THE COMMISSIONERS OF THE WATER DISTRICT SERVE AT THE PLEASURE OF THE LAFOURCHE PARISH POLICE JURY; CONSEQUENTLY, THE CONTRACT AWARDED TO HECK IS NULL AND VOID BECAUSE OF ITS FIVE YEAR DURATION AND NON-CANCELLABILITY PROVISIONS, SINCE IT CEDES AWAY CONTROL AND EMBARRASSES THE LEGISLATIVE AND GOVERNMENTAL POWERS OF THE POLICE JURY, THEREBY VIOLATING PUBLIC POLICY.
"In this allegation, plaintiff argues to the Court that the Heck contract because *776 of its five year term must be declared invalid since it extends beyond the term of the Commissioners who awarded it. Their argument and the cases which they cite in support thereof is a rather universal contractual rule that political corporations cannot enter into contracts which will bind successors. If this rule is to be stringently applied, then the Board of Commissioners of Lafourche Parish Water District Number One can enter into no contracts at all which could legally endure for more than twenty-four hours. There is no question that the Commissioners only serve at the pleasure of the appointing body, the Lafourche Parish Police Jury. This was clearly demonstrated when apparently the appointing authority, piqued by the action of the Board in signing this contract, summarily replaced a member to make the minority the majority-after-the-fact. An inflexible application of this contractual rule is necessarily impossible with a Board so constituted.
"The evidence submitted by the plaintiff to show the Jury's dissatisfaction with this contract and a previous engineering contract is clearly indicative to the Court that despite the distinct possibility of summary termination of a Commissioner's tenure, the history of the Board prior to the fateful meeting of July 7th leaned more toward longevity in its members' tenure than a rapid turnover in appointments.
"The statutory provisions establishing water districts and making them bodies `corporate in law, with all the powers of a corporation, and all powers necessary for it to carry out the objects for which it was created'[1] necessarily include the authority to negotiate contracts which would conceivably extend beyond the tenure of the individual Commissioners.
"The Court finds no merit in that portion of Point 3 which claims invalidity of the contract because of its five year duration.
"An additional segment of this allegation contends `it cedes away control and embarrasses the legislative and governmental powers of the Police Jury.' It would appear to the Court that it was the intent of the Legislature in R.S. 33:3811, et seq., to empower the Police Jury to create water districts and to delegate to these bodies corporate control of water production and distribution in specified areas. Surely the exercise of this statutory authority by the Police Jury cannot be considered a violation of public policy. The plaintiff has argued that the contract signed with the defendant by the Water District essentially turned over the control of the District to the engineer, but the plaintiff has not by a preponderance of the evidence sustained this allegation. The engineer, under the terms of the contract, agrees to perform those professional services `authorized' by the District and all phases of the contract require submission to the District for review and approval of the work suggested by the engineer. Nowhere does it appear that by signing this contract the District has improperly divested itself of the authority delegated to it by the governing authority.
"It is true that there was testimony from a member of the Police Jury that he and possibly some other Jurors who did not testify were not favorably inclined to the engineering contract executed by the District, but it is equally clear that if the majority of the members of the Police Jury felt that the Commissioners were acting improperly and usurping their authority, they had a totally adequate remedy at any time. The law clearly provided that the Commissioners served at the pleasure of the governing authority. At least through July 7, 1975, the Police Jury members had chosen not to evidence their displeasure and therefore the Court cannot assume that the Police Jury was `embarrassed' by any alleged abuse of power on the part of the Board of Commissioners. As a matter of fact, from the transcript of the Minutes filed, the Police Jury was aware for several months before the signing of the contract that the Board intended to function as the body corporate, *777 which it was, and to exercise the power to carry out the objects for which it was created, employing its independent judgment. If the answer that the board made to the February Resolution of the Jury displeased it or created in it the impression that the Board was exceeding its authority, the Jury had ample time to express its displeasure by removing the offending members.
"Accordingly, the Court finds no merit in this allegation of invalidity.
"4. THE CONTRACT IS NULL AND VOID SINCE IT WAS LET ON A COST-PLUS BASIS IN VIOLATION OF THE LOUISIANA PUBLIC CONTRACTS LAW.
"Plaintiff bases this allegation of nullity on the provisions of R.S. 38:2217, which provides:
`No contract shall be let on a cost-plus basis.'
This section is found in Part II of Chapter 10 of Title 38 of the Revised Statutes. Title 38 deals with Public Contracts, Works and Improvements, Chapter 10 thereof is entitled `Public Contracts,' and Part II of Chapter 10 is entitled `Letting Contracts,' and as such constitute the statutory requirements for the letting of public work.
"Plaintiff maintains that the above quoted section, 38:2217, is clear and unambiguous and applies to all public contracts without exception and that the only issue before the Court is to determine `whether the Heck contract is cost-plus in nature.'
"Defendant on the other hand argues that there are two issues to be considered by the Court, namely, are contracts of water districts subject to the proscription of cost-plus contracts and, if so, is the Heck contract cost-plus in nature.
"Let us, therefore, examine the contract from the basis of `cost-plus.' Admitting that there were no reported cases specifically interpreting R.S. 38:2217, plaintiff cited Standard Oil Company of Louisiana v. Fontenot [198 La. 644], 4 So.2d 634 (1941), for an analysis by the Louisiana Supreme Court of the nature of a cost-plus contract. In that case the Supreme Court stated that there were three types of contracts that an independent contractor could enter into: a lump sum, a cost-plus-a-fixed-fee, and cost-plus-a-percentage-of-the-cost. The court pointed out that in the latter two the contractor ran no risk of losing since this risk could exist only in the lump sum contract. While this case is not determinative of the legislative definition of `cost-plus,' it is interesting to note that the court said:
'[* * *] In all three types of contracts, however, the contractor is certainly an independent contractor, if the provisions of the contract make him so and do not in any way indicate or state that the parties intended that it was a contract of employment or agency or that the contractor was an instrumentality of the Government. In all of the above cases, the contractor operates his business for his own profit and gain. He is not performing governmental functions and has no authority to, in any way, bind the owner or Government either for the purchase of the materials or for the hiring of labor.' ([4 So.2d at 643] Emphasis supplied by the Court)
It would appear, therefore, that in this case cited by plaintiff the Supreme Court has distinguished a `contract of employment' from contracts entered into by a governmental agency at arm's length with an independent contractor.
"As defendant pointed out in his brief, `A cost-plus contract is one where the contracting party receives all of the costs and also the plus.' In the Standard Oil Company of Louisiana case, supra, the Supreme Court opinion emphasized this point by hyphenating the titles of such jobs indicating the connection between the cost-plus-a-fixed-fee or the cost-plus-a-percentage-of-the-cost. It appears, therefore, that a true cost-plus contract requires that the contractor receive not only the `plus,' but also the `cost.' On examination of the compensation portions of the contract in question, Article III of the Heck contract indicates that at least for the basic services on the preliminary phase, the design phase, and the construction phase the defendant *778 receives only the `plus,' which is determined as a percentage of the cost which he does not receive, but which goes to whatever contractor is awarded the job.
"In compensation for `Special Services,' however, the defendant would receive by this contract the cost (Heck's salary costs) plus a multiplier of 1.5 and, therefore, he receives for this service both the cost and the plus, and this section is indeed `cost-plus.' Again, in the section designated as `Direct Non-Salary Expenses' the defendant receives his `cost' (living and traveling expenses, programming costs, et cetera) plus a 15% service charge, which again, accepting our definition of `cost-plus,' makes this section also cost-plus.
"This determination that two of the five compensation sections are `cost-plus' raises the question as to whether or not these `cost-plus' sections taint the entire contract and render it invalid. It is an interesting question, but not one which requires an answer from this Court because it appears to the Court that the second issue raised by defendant, i. e., the applicability of the cost-plus prohibition to this contract, is controlling. It is the Court's opinion that R.S. 38:2217 does not apply to the engineering contract in question and, therefore, the Court need not determine whether the minor `cost-plus' features of the contract render the entire contract invalid.
"The Court has reached this conclusion, however, for a reason other than that suggested in defendant's brief. The defendant contended that the source law of R.S. 38:2217 was Act 73 of 1926 and, since that act did not include water districts in its title, it had no application to this type of political subdivision. In its rebuttal plaintiff correctly pointed out that while the 1926 Act did not refer to water districts, it was amended in 1935 by Act 20 at the Fourth Extraordinary Session of the Legislature to include all political subdivisions of the State.
"However, it is the title of this Act that indicates to the Court that consultant or engineering contracts of the type here in question are excluded from the `cost-plus' prohibition of R.S. 38:2217. The 1935 Act, in bringing water districts within the purview of the Public Contract Law, defined the legislative intent to include:
"An Act relative to the proper letting of contracts for the purchase of materials or supplies, or the doing of public work, by the parochial, municipal and other public corporations and political subdivisions of the State; providing the method of letting such contracts; prescribing a penalty for the violation of the provisions hereof; and repealing all laws or parts of laws, general or special, in conflict herewith.' (Emphasis supplied by the Court)
It appears, therefore, that the contracts contemplated by the Legislature were for `the purchase of materials or supplies or the doing of public work.'
"R.S. 38:2217 is a re-statement of Section 7 of Act 73 of 1926 and, therefore, applies to the purchase of supplies or the doing of public work. Since obviously the Heck contract was not for the purchase of materials and supplies, it can only come under the proscription of R.S. 38:2217 if it is for the `doing of public work.' Fortunately for the Court, the Supreme Court of Louisiana for the first time defined the term `public work' in Wallace Stevens, Inc. v. Lafourche Parish Hospital District # 3, 323 So.2d 794, 796 [La.1975]. The Court said:
`While the courts of other jurisdictions have thus defined the term public work, this Court has not as yet spoken on the subject. From the statutory language, however, it appears that the term means a building, physical improvement, or other fixed construction. It does not include telecommunications services that may be provided in a building or in connection with its use.
`By the great weight of authority, public utility service contracts are not within the intendment of statutory bid requirements. (Numerous citations)'
To this Court the message of this case is clear. `Public work' refers to physical construction and an engineering contract for *779 engineering services is consultant and professional in nature and not a contract for `a building, physical improvement, or other fixed construction.'
"Inasmuch as the Heck contract was not for the purchase of materials or supplies and not for the doing of public work, we conclude that the `cost-plus' proscription of R.S. 38:2217 is inapplicable to this contract.
"It may be well to note in passing, since considerable time was devoted by counsel for both sides to discussing the pro's and con's of the A.S.C.E.-Manuals & Reports on Engineering Practice-No. 45, which was introduced in evidence as Exhibit D-13, that this would appear to be the Bible of the engineering set. Defendant devoted considerable argument to extolling the qualities of this manual and plaintiff in rebuttal noted in discussing the `Direct Non-Salary Expenses' section of the contract that `this is the only provision in the contract that refers to the A.S.C.E. Manual and merely copies verbatim language from the manual.' This statement is not entirely accurate. An examination of the contract in question indicates that Article II-Section A can be found on page 11 of the manual, Article II-Section B on page 12, Article II-Section C on page 12, Article II-Section D on pages 13 and 14, Article III-Section A on pages 26, 27, and 31, Article III-Section B on pages 22 and 23, and Article III-Section D on page 23 of the manual. It would appear, therefore, that the contract in question is almost as basic an engineering contract as the standard notarial forms used by lawyers for sales and mortgages, and if these engineering contracts are invalid because of form, the courts can prepare for an onslaught of cases involving such contracts.
"5. THE CONTRACT IS NULL AND VOID SINCE IT WAS LET WITHOUT COMPETITIVE BIDDING IN VIOLATION OF LOUISIANA PUBLIC CONTRACT LAW.
"Plaintiff maintains on this point that R.S. 38:2211 `establishes the guidelines for the advertisement and letting of contracts by any public corporation or political subdivision of the State, and in particular, requires competitive bidding.' Plaintiff correctly stated that the contract in question was stipulated as having been let without benefit of competitive bidding. Because of this it argues the invalidity of even this contract for consultant services. In support of this contention plaintiff cites the case of Louisiana v. McIlhenny [201 La. 78], 9 So.2d 467 [1942], as a case of first impression on this question and conceded that it held that the contract was not void since it was one for the employment of professional services for which competitive bidding was not required.
"The plaintiff, however, further contends that this 1942 case was [held to have been] legislatively overruled in the 1972 case of Fisher v. State, Through Department of Labor, 265 So.2d 817 [La.App. 3rd Cir. 1972]. The Court has read with interest the McIlhenny case where in 1942 the Supreme Court of Louisiana declared that contracts for personal service of professional character calling for technical skill and experience of a high degree were not covered by the competitive bid law, and with equal interest the 1972 Fisher case in which, according to the plaintiff, the Third Circuit declared that the McIlhenny case had been legislatively overruled. It is true that in the Fisher case the Third Circuit, in discussing the McIlhenny case, stated:
`Thus, it would appear that the legislature consciously provided against such a result as occurred in the McIlhenny case, supra. The statutes clearly make advertisement mandatory, and where such advertisement procedures are not followed, such contracts are declared to be void ab initio and of no effect under the terms of LSA-R.S. 39:191." [265 So.2d at 820]
This Court must agree with defendant's interpretation and its distinguishing of these two cases. It is also true that in the Fisher case the appellant had urged that he fell within the McIlhenny case where the Supreme Court had declared that the contract was not void `since it was one for the employment of professional services, and such contracts for professional services are *780 generally and almost universally regarded as not being subject to usual advertisement and bid requirements, because of the expertise and professional skills involved,' and that the Third Circuit found no merit in this contention. But a careful reading of the Fisher case creates the impression in this Court that the Third Circuit in finding no merit in Fisher's contention that his contract was exempt from the usual advertisement and bid requirements is as logically a determination that the Fisher court did not feel that Fisher's services could be classified as falling into the category of `expertise and professional skills.' What the Fisher case did definitely hold, citing Conley v. City of Shreveport, 216 La. 78, 43 So.2d 223 [1949], and Labit v. Terrebonne Parish School Board, 49 So.2d 431 [La.App. 1st Cir. 1950], was that the Legislature in adopting Act 370 of 1952 made advertising for public contracts mandatory and not discretionary. This Court does not feel that this 1952 legislation or the Fisher case additionally removed contracts for professional services from the exemption to the competitive bid law.
"At any rate, the 1975 Supreme Court case of Wallace Stevens, Inc. v. Lafourche Parish Hospital District # 3, 323 So.2d 794 (referred to as controlling on Point Four) is also controlling on this point. Plaintiff, in its interpretation of the Fisher case in its brief, stated that the Fisher case now clearly reflects the present rule of law in Louisiana and requires contracts for consultant services to be let on the basis of competitive bidding and maintains that its interpretation is consistent with the purpose of the Public Bid Law as declared by the Supreme Court of Louisiana in Boxwell v. Department of Highways [203 La. 760], 14 So.2d 627 [1943], but in the 1975 Stevens case the Supreme Court clearly stated:
`The Public Bid Law is a salutary provision designed to protect the public fisc from favoritism and exorbitant costs. Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627 (1943). The statute, however, does not apply to every contract of a governmental agency.
`To fall within the above statute, a public corporation or political subdivision must either have a "public work" to be done exceeding $2500, including both labor and materials, or purchase "materials or supplies" exceeding the sum of $1000. Otherwise, there is no requirement for public bids.' [323 So.2d at 795]
"To this Court this declaration is very clear. The Public Bid Law applies only to the purchase of materials or supplies or the doing of public work. Since it is clear, as the Court stated in Point Four, that this contract was not for the purchase of materials or supplies nor could it be construed to fall within the definition of `public works,' as defined for the first time in this Stevens case, there was no requirement that the engineering contract executed on July 7th be let only after competitive bidding and we must, therefore, hold that the absence of competitive bidding in awarding the contract to defendant did not make the contract invalid.
"6. THE CONTRACT IS NULL AND VOID SINCE IT WAS LET ON AN EXCLUSIVE BASIS THEREBY CREATING A MONOPOLY AND RESTRAINING TRADE IN VIOLATION OF LOUISIANA LAW.
"In support of this allegation plaintiff argues that the action of the Water District Board of Commissioners on July 7, 1975, in signing an exclusive engineering contract with defendant was beyond the scope of its authority since it had not been granted the express power to award such a contract. In furtherance of this position it maintains that an exclusive engineering contract is tantamount to the granting of a monopoly in restraint of trade and violates Louisiana law. Plaintiff contends that the prevailing rule prohibiting political subdivisions from granting such an exclusive privilege or monopoly unless expressly permitted by legislative fiat was expounded by the Louisiana Supreme Court in discussing the authority of municipal corporations. Plaintiff also cites many common law authorities to the same effect and concludes that the Lafourche Parish Water *781 District was never empowered with such extraordinary powers.
"To accept this theory, however, the Court must agree that awarding an exclusive engineering contract is
"a) the granting of extraordinary powers, and,
"b) required an express delegation of such power by the Legislature.
"The Court has read with interest the cited authorities, but cannot accept either position. It does not seem in any way extraordinary for a Board of Commissioners, not required to be qualified engineers, to sensibly employ the services of trained experts to assure that the mandate of the governing authority in creating the Water District is properly carried out to achieve its purpose. Nor does the Court agree that there must be an `express' delegation of authority to negotiate such a contract of employment.
"As part of the authority granted by the Legislature to the governing authority of Lafourche Parish to create water works districts within its geographical limits the Legislature specifically provided in R.S. 33:3815 that:
`Any waterworks district thus created and named or numbered by a police jury shall constitute a body corporate in law, with all the powers of a corporation, and all powers necessary for it to carry out the objects for which it was created.. . .'
An engineering contract to assure that the water works system operated by the Board of Commissioners is an adequate system that functions properly seems to this Court to be a basic matter and not an unexpected or extraordinary situation. The maintenance of the water works system through the guidance of a competent engineering firm appears to this Court to be the delegation by the Board of Commissioners of a proprietary function and not a governmental function.
"Defendant in its brief cited for the Court the case of Stone v. Police Jury of Parish of Calcasieu [226 La. 943], 77 So.2d 544 [1954]. In that case the dispute was over the right of the governing authority to grant an exclusive limousine franchise in connection with the operation of its airport terminal. The Supreme Court, after acknowledging that police juries under the laws of this State have no powers except those delegated to or conferred upon them by the Legislature, enumerated the powers granted to political subdivisions establishing airports, none of which expressly covered the granting of a limousine franchise. In affirming the Police Jury's authority to make a contract for exclusive rights of limousine service, the Court said:
`It is clear from the above provisions that the powers there delegated to the various political subdivisions were conferred on them not primarily in their capacity as agents of the State for governmental purposes, but rather as organizations to care for local needs in a private or proprietary capacity; . . . it necessarily follows that all incidental powers are fairly implied which are necessary to perform such functions in the same efficient manner as would a private person.. .. [I]t would be unwarranted to hold that the Police Jury of Calcasieu Parish did not have the power to make contracts to insure the performance of these services. In the absence of a showing of fraud, oppression or gross abuse, we will not substitute our judgment for that of the body authorized by statute to conduct the operation of the airport, see Caz-Perk Realty, Inc. v. Police Jury of Parish of East Baton Rouge, 213 La. 935, 35 So.2d 860, and cases therein cited.
`Since the Police Jury was empowered to enter into such a contract, the plaintiff's contention that the purpose of the Ordinance was to protect a monopoly cannot be legally sustained; its object was to protect the right granted by the contract, so as to insure to the person who obligated himself to provide the service an adequate return for his furnishing of transportation facilities, proper equipment, competent drivers, and sufficient insurance to protect the public.' [77 So.2d at 547]
*782 This Court can think of no better way to express its appreciation of the power of the Water District to enter into an exclusive engineering contract than by adopting the reasoning of the Supreme Court in the Stone case.
"This allegation of invalidity is also without merit.
"7. THAT IN THE ALTERNATIVE, AND ONLY IN THE EVENT THAT THE COURT DECLARES THE CONTRACT TO BE VALID AND BINDING, PETITIONER ALLEGES THAT THE CONTRACT IS NOT AN EXCLUSIVE CONTRACT THEREBY PERMITTING THE WATER DISTRICT TO EMPLOY A STAFF ENGINEER OR OTHER ENGINEERING FIRMS TO DO THE WORK DEEMED NECESSARY BY THE WATER DISTRICT.
"Inasmuch as the Court has overruled the previous allegations of invalidity argued by plaintiff, it is necessary to pass on this alternative request that the contract be deemed non-exclusive. A reading of the contract would suggest otherwise. The contract states in its preamble, `WHEREAS, the services of an Engineering Firm are needed to assist with the projects.. ..' (Emphasis supplied.) This does not say engineering firms are needed, but specifically indicates an intent with the word `an' to limit to a single firm. Additionally, the testimony of the Water District Commissioners at the trial, the verbatim transcripts of meetings prior to the meeting of July 7th, 1975, and the `pre' and `post' contract actions of the Police Jury all indicate to this Court a clear intent to enter into an exclusive contract with the defendant. Supplementing this is the lack of any evidence or testimony whatsoever to indicate that plaintiff contacted any other firms or executed with anyone else a similar contract covering the same five year period.
"Finally, if it was not intended to be exclusive, but was merely a `guideline' contract, why is it necessary to seek the cancellation thereof? Perhaps the answer is found in the contract itself, which also points to the exclusive intent of the Water District since it states that it `is desirous of obtaining Engineering Services in connection with the planning, design, and construction of all public improvements . . .' (Emphasis supplied.) Article II of the contract which covers the services for which the District has contracted is certainly comprehensive in its scope, and Article VIII prohibits the assignment of any rights or interest by either party without a written agreement. Surely if it had not been intended to be an exclusive contract there would have been no necessity to secure the defendant's approval to assign similar work to another engineering firm.
"In the opinion of this Court the contract must be considered exclusive and this alternative plea is also denied."
The plaintiff urges on appeal that the trial court erred in rejecting each of its seven contentions. After a careful review of the facts and law in the case in point, we conclude that the judgment of the trial court as to the validity and the exclusive nature of the contract is correct for the reasons set forth in the written reasons.
The plaintiff also contends that the trial court erred in assessing court costs against the plaintiff in contravention of La.R.S. 13:4521, which provides:
"Except as hereinafter provided, neither the state, nor any parish, municipality, or other political subdivision, public board or commission shall be required to pay court costs in any judicial proceeding instituted or prosecuted by or against the state or any such parish, municipality or other political subdivision, board or commission, in any court of this state or any municipality of this state, including particularly, but not exclusively, those courts in the Parish of Orleans and the City of New Orleans. This Section shall have no application to stenographers' costs for taking testimony. As amended Acts 1964, No. 509, § 1."
*783 La.-R.S. 13:4521 clearly relieves the Water District, as a public commission, from liability for court costs except those costs relating to the taking of testimony by the stenographer.
Therefore, the judgment of the trial court is affirmed, except to the extent it is amended to relieve the Water District of payment of the court costs, except for the aforesaid stenographic charges.
This minor amendment in no way detracts from the comprehensive, well-reasoned decision of the trial judge whom we compliment for his excellent analysis of the law and clarity of writing.
The costs of these proceedings are assessed to the plaintiff only to the extent permitted by law.
AMENDED AND AS AMENDED, AFFIRMED.
NOTES
[1] R.S. 33:3815.