424 So.2d 423 (1982)
STATE of Louisiana, Appellee,
v.
Stewart MARSHALL, Appellant.
No. 15105-KA.
Court of Appeal of Louisiana, Second Circuit.
November 29, 1982.
Rehearing Denied January 14, 1983.
*424 Samuel Thomas, Tallulah, and Captan Jack Wyly, Lake Providence, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, James David Caldwell, Dist. Atty., Tallulah, for appellee.
Before HALL, FRED W. JONES, Jr. and NORRIS, JJ.
HALL, Judge.
Defendant Stewart Marshall, the Chief of Police of the town of Lake Providence, was charged by bill of information with (1) violation of LSA-R.S. 14:134[1] (malfeasance in *425 office) in that he intentionally performed a duty lawfully required of him as such officer in an unlawful manner; and (2) violation of LSA-R.S. 14:126.1[2] (false swearing for purpose of violating public health or safety) in that he made a false statement, report, or allegation concerning the commission of a crime for the purpose of depriving Reginald Davis of rights, privileges, or immunities secured by the United States Constitution and laws or by the Louisiana Constitution and laws. After trial by a six-member jury the defendant was convicted on both counts and was sentenced to three years at hard labor on each count to run concurrently. Defendant appealed from the convictions and sentences, making 11 assignments of error.

Facts
The alleged false statements giving rise to the charges in this case were made by defendant in an unsworn "affidavit" and orally in the course of obtaining a warrant from the mayor of Lake Providence for the arrest of Reginald Davis on a charge of disturbing the peace at Lake Providence Junior High School in violation of a town ordinance.
The testimony of the state's witnesses discloses the following facts and events.
Defendant, Stewart Marshall, is the elected police chief of the town of Lake Providence and was serving in that capacity on April 1, 1981. On that date Reginald Davis, a Tallulah police officer whose wife was a school teacher at the Lake Providence Junior High School, received several telephone calls during the morning at his home regarding his wife's activities. In one of the calls a female caller told Davis he could find his wife and the principal at a motel in Lake Providence. Davis called his wife at school and asked her to come home to discuss their marital problems. When Mrs. Davis refused to come home Davis said he was going to come to the school and she asked him not to do that. Mrs. Davis was upset by the call and advised the principal of the school about the call and that she was afraid Mr. Davis would come to the school. The principal was aware that Davis had accused his wife of having affairs with the principal and other men at the school and connected with the school system.
Davis decided to drive to Lake Providence to check on his wife and first drove by the school where he saw his wife's car and the principal's car parked. He went into the school building and proceeded to go toward his wife's classroom without first getting permission from the principal in *426 accordance with school policy. By this time the school principal, Mr. Lane, had been made aware that Davis was in the school building and he made a call to the Lake Providence police. While Lane was on the telephone Davis, after learning that his wife was not in her classroom, came into the principal's office and overheard Lane telling the police that the situation was critical and to send a police officer. Davis inquired as to his wife's whereabouts and inquired more than once if she was in the principal's office. Davis apparently satisfied himself that his wife was not in the principal's office and left the school without further incident.
After getting a message from the police dispatcher that the principal of the school had requested that a police officer come to the school, Officers White and Greer of the Lake Providence Police Department went to the school and investigated the incident. By the time they got to the school Davis had gone and the officers interviewed the principal, Mrs. Davis, and other school personnel. They were told of Davis's visit to the school and were told by the principal that he was afraid and frightened and that the man seemed to be violent. Mrs. Davis told the officers she was sure Davis had a gun because he carries a gun all the time. They were also told that Davis had not used any loud, boisterous, or obscene language or otherwise caused a disturbance. Both Lane and Mrs. Davis said they did not want to file any charges. Lane requested that the officers contact Davis and tell him not to come back to the school and that they contact the Tallulah Police Department about the incident. The officers left the school and when they got back to the police department, had a telephone call from Davis. Davis told Officer White that he had been to the school and went directly to his wife's classroom, that his wife was having an affair with the principal, and that he had been watching them all morning. He said he would not return to the school and was told by the officer that if he had a complaint he should report it to the school authorities.
Chief Marshall also got the report from the police dispatcher and went to the school, arriving after Officers White and Greer had left, and he conducted his own investigation. The events of the morning were related to him and the principal told him that he had reason to fear Davis because of what he was saying, that he feared Davis might have a gun, that something needed to be done and the principal told the chief to ask Davis not to come back to the school. The school personnel were not sure whether Davis had a gun because he was dressed in army fatigues with a loose fitting shirt that was not tucked in.
After leaving the school Chief Marshall called Officer White and asked her to prepare an affidavit for the purpose of securing a warrant from the mayor for the arrest of Davis on a charge of disturbing the peace. Officer White filled out an affidavit form which recited that Reginald Davis "did violate Ordinance No. DISTURBING THE PEACE (LAKE PROVIDENCE JUNIOR HIGH SCHOOL)", followed by the following factual information:
"April 1, 1981 Time 9:13 AM Reginald Davis enter the Lake Providence Junior High School, and went directly to his wife (Erma Davis) classroom. Without the principal permission, and return to Principal Office (Mr. Theodore Lane) and ask if his wife (Erma Davis) was in Mr. Lane office."
Although the affidavit form was typed up with the names of Officers Greer and White as deponents, they declined to sign the affidavit because they did not personally witness the events and did not believe Davis had disturbed the peace. Chief Marshall had Officer White write the chief's name at the top of the affidavit and then Chief Marshall and Officer White went to see the mayor, taking with them the affidavit and a warrant of arrest which had previously been signed by the mayor in blank and had been filled out by Officer White.
Officer White testified that Marshall told the mayor "I'm going to arrest me a Tallulah policeman" and "he has been out to the school raising sand with a shotgun". Mayor *427 Jackson, a defense witness, testified Chief Marshall told him that there was a man out at the school "raising hell" but that the chief did not mention the man having a gun. Chief Marshall testified that he told the mayor that they (the people at the school) think he had a gun, meaning a pistol. The mayor signed the affidavit form, but as previously mentioned the affidavit was not signed or sworn to by either Chief Marshall or the police officers.
The Tallulah Police Department was advised of the issuance of the warrant and Damon Williams, a state trooper who was acting as chief of police of Tallulah, came to Chief Marshall's office. Williams tried to talk Marshall out of executing the warrant but was unable to do so and Marshall declined to accompany Williams out to the school so that Williams could make his own investigation.
Davis was arrested and booked at the Tallulah Police Department. He was tried in the Lake Providence Mayor's Court on the charge of disturbing the peace and was convicted and fined $26. His conviction was reversed on an appeal to the district court.
Chief Williams requested the state police to investigate the incident and an investigation was conducted by State Trooper Lester. On his complaint and report the bill of information against defendant Marshall was filed by the district attorney.

Assignments of Error
Among defendant's several assignments of error is the contention that the evidence is constitutionally insufficient to support a finding that the state proved beyond a reasonable doubt each essential element of the crimes charged under the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard the appropriate question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. State v. Morris, 414 So.2d 320 (La.1982). We find merit in this assignment of error as to both crimes charged, mandating reversal of the convictions.
To support the conviction for violation of LSA-R.S. 14:126.1[3] the state was required to prove beyond a reasonable doubt the following essential elements of the crime: (1) that a statement was made by the defendant; (2) that the statement was false; (3) that the defendant knew or had reason to believe the statement or a material part thereof was false; (4) that the statement concerned the commission of a crime; (5) that the statement was made to deprive a person of a right, privilege or immunity secured by the United States Constitution and laws or by the Louisiana Constitution and laws; (6) that the statement was made to an official or agency of the state or any parish, city, or political subdivision thereof; and (7) the statement was made with the intent to cause an investigation of or any other action to be taken as a result thereof.
Viewing the evidence in the light most favorable to the prosecution, it is our *428 judgment that a rational trier of fact could not have concluded beyond a reasonable doubt that the statements made by defendant were false, or that the defendant knew or had reason to believe the statements were false, or that the statements concerned a crime.
Defendant's statements to the mayor, contained in the "affidavit" and made orally, considered in the light of the information which had been furnished to defendant by persons at the school who had firsthand knowledge of the events, while perhaps exaggerated and to some extent with little foundation, cannot be said to be wholly false or to have been made with knowledge that they were wholly false.
The factual recitations in the "affidavit" were true, as conceded by all the state witnesses. The allegation that Davis violated the municipal ordinance on disturbing the peace amounted at most to an erroneous legal conclusion rather than a false statement of fact. The statement that Davis was "raising hell" or "raising sand", although perhaps an exaggeration, cannot be regarded as wholly false in view of the facts testified to by the state's witnesses concerning the phone call by Davis to his wife, the accusations made by him, his coming to the school during school hours for the admitted purpose of discussing the matter with his wife over her objection, his going to her room without checking with the principal, his questioning of the principal's statement that his wife was not in the principal's office, and the alarmed and frightened reaction of the principal and other school personnel to Davis's actions, however overtly passive they may have been. The statement that Davis had a gun may have been false (Davis testified at trial that he did not have a gun with him), but was supported by Mrs. Davis's statement to the principal and to the police officers that Davis "always" carried a gun and the principal's expressed fear that Davis had a gun.
We conclude that the evidence, viewed in the light most favorable to the prosecution, is not sufficient to lead a reasonable trier of fact to the conclusion beyond a reasonable doubt that the statements made by the defendant were false and were made with the knowledge that they were false. To the contrary, the evidence presented by the prosecution establishes that there was some basis for the statements in the information furnished to defendant in his investigation.
We further conclude that the state failed to prove that the alleged false statements concerned the commission of a crime. LSA-R.S. 14:126.1 prohibits the making of a false statement, report or allegation "concerning the commission of a crime." The alleged false statements the accused in this case is charged with making concern the violation of a municipal ordinance.[4] The violation of a municipal ordinance is not a "crime" as that term is defined in Title 14.
LSA-R.S. 14:7 provides:
"A crime is that conduct which is defined as criminal in this Code, or in other acts of the legislature, or in the constitution of this state."
The comment following that section reads:
"This article makes it clear that the Code continues the tradition that the Louisiana criminal law is purely statutory, there being no other crimes than those defined in the Code or other statutes of the state. Crimes Act of 1805; State v. Robinson, 143 La. 543, 78 So. 933 (1918). It is intended to exclude from the designation `crime' all offenders [sicprobably should be "offenses"] denounced in municipal ordinances." (Emphasis supplied).
*429 In holding that evidence of convictions for municipal offenses was not admissible under LSA-R.S. 15:495 to impeach a witness's credibility, the Supreme Court in State v. Ramos, 390 So.2d 1262 (La.1980) stated:
"A municipal offense is not a crime within the meaning of La.R.S. 15:495, which provides that `[e]vidence of conviction of crime' is admissible for impeachment of a witness's credibility under prescribed circumstances. Crime is defined in La.R.S. 14:7 as `that conduct which is defined as criminal in this Code, or in other acts of the legislature, or in the constitution of this state.' It was intended to exclude from the designation `crime' all offenses established by municipal ordinances. See Reporter's comment, L.S.A.-R.S. 14:7...."
City of New Orleans v. Adjmi, 249 La. 346, 186 So.2d 616 (1966) also held that violations of municipal ordinances are not regarded as crimes. The court held:
"The authorities which we have cited above conclusively show that this court consistently for many years held that violations of municipal ordinances are not to be regarded as `crimes' in the strict sense in which the term is used in the Constitution and the criminal statutes, ...."
In a civil suit for damages for wrongful arrest, Roberts v. American Employers Ins. Co., Boston, Mass., 221 So.2d 550 (La.App.3d Cir.1969), it was held:
"Under the authorities cited above, the violation of the municipal ordinance of the City of Jennings, relative to disturbing the peace, was not a `crime' within the intendment of our criminal statutes in effect at the time of the incident in question on December 28, 1966."
Article 933 of the Code of Criminal Procedure defines an "offense" as including both a felony and a misdemeanor, and "misdemeanor" is defined as including the violation of an ordinance providing a penal sanction. These provisions of the Code of Criminal Procedure do not, however, have the effect of broadening the definition of "crime" as that term is used in Title 14, the Criminal Code, so as to include within its meaning the violation of a municipal ordinance.
It follows, therefore, that the state failed to prove an essential element of the crime charged, that is, that the false statements allegedly made by the defendant concerned "the commission of a crime."
To support a conviction of a violation of LSA-R.S. 14:134 the state was required to prove beyond a reasonable doubt that the defendant was a public officer and intentionally performed a duty lawfully required of him in an unlawful manner. In this case the charge of unlawful performance of a duty is grounded on defendant's alleged performance of his duty as chief of police in violation of LSA-R.S. 14:126.1. Since we have concluded that the state failed to prove that defendant was guilty of the unlawful act charged, it follows that the state has failed to prove that defendant performed a duty required of him in an unlawful manner. Defendant's conduct in the performance of his official duties, albeit clearly substandard, was not proven to be unlawful. The conviction on the charge of malfeasance in office must also be set aside.

Decree
Accordingly, and for the reasons assigned, the defendant's convictions and sentences on both charges are reversed and set aside.
NOTES
[1] LSA-R.S. 14:134:

"Malfeasance in office is committed when any public officer or public employee shall:
"(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
"(2) Intentionally perform any such duty in an unlawful manner; or
"(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.
"Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.
"Whoever commits the crime of malfeasance in office shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars or both."
[2] LSA-R.S. 14:126.1:

"No person shall make a false statement, report or allegation concerning the commission of a crime for the purpose of violating, disrupting, interfering with or endangering the public health or safety, or to deprive any person or persons of any right, privilege or immunity secured by the United States Constitution and laws, or cause such false statements or report to be made to any official or agency of the state or any parish, city or political subdivision thereof, or to any judicial, executive or legislative body or subdivision thereof within this state, knowing or having reason to believe the same or any material part thereof to be false and with the intent to cause an investigation of or any other action to be taken as a result thereof.
"Any person or persons convicted of violating the provisions of this Section shall be punished by imprisonment for not less than one year nor more than five years, with or without hard labor, or by a fine of not less than one hundred dollars nor more than one thousand dollars, or by both such fine and imprisonment."
[3] The title to Section 126.1 is misleading insofar as it describes the crime as "false swearing" because the statute does not require that the prohibited false statement be made under oath or affirmation. Compare LSA-R.S. 14:125 (false swearing) and LSA-R.S. 14:126 (inconsistent statements; false swearing). It is interesting to note that Section 126.1 was added to the Criminal Code by Act 81 of 1960, as part of a package of legislation designed to inhibit certain desegregation activities. See 21 La.L.Rev. 85 (1960-1961). See also State v. Goldfinch, 241 La. 958, 132 So.2d 860 (1961). Numerous additions and amendments to the Criminal Code were made, with severe penalties imposed for violation of the new and expanded crimes. Section 126.1 is inarticulately drafted, and when read with a companion section added by Act 68 of 1960, Section 126.2, it can be questioned whether it was intended that the language "for the purpose of violating ... the public health or safety" and "to deprive any person ... of any right ... secured by the United States Constitution" refer to the "commission of a crime" for that purpose or the making of "a false statement" for that purpose. Our research, including use of the Westlaw computer, does not reveal a reported decision of any prosecution under Section 126.1 since its enactment.
[4] The town ordinance on disturbing the peace generally tracks the articles of the Louisiana Criminal Code on disturbing the peace, LSA-R.S. 14:103 and 103.1, as they read prior to the repeal of subsection A(7) of Section 103 in 1979 after that subsection was declared unconstitutional in State v. Ganch, 263 La. 251, 268 So.2d 214 (1972). Subsection A(7) of the town ordinance includes within the definition of disturbing the peace the "[c]ommission of any other act in such a manner as to unreasonably disturb or alarm the public." Presumably Davis was charged under this subsection since his conduct was not of the nature described specifically in any of the other subsections.