420 So.2d 1259 (1982)
Walter CLOUD, Plaintiff-Appellee,
v.
STATE of Louisiana, et al., Defendant-Appellant.
No. 82-140.
Court of Appeal of Louisiana, Third Circuit.
October 13, 1982.
Writ Denied December 10, 1982.
*1260 Steven R. Giglio, Baton Rouge, for defendant-appellant.
Eugene P. Cicardo, Alexandria, for plaintiff-appellee.
Hicks & Breedlove, Roger J. Breedlove, Gist, Methvin, Hughes & Munsterman, David A. Hughes, Alexandria, for defendant-appellee.
Before DOMENGEAUX, DOUCET and YELVERTON, JJ.
YELVERTON, Judge.
Walter M. Cloud, M.D., sued the State of Louisiana in tort, and alternatively under *1261 Workers' Compensation, for injuries received when he fell on the front steps of Central Louisiana State Hospital in Pineville while performing duties as deputy coroner of Rapides Parish. In addition, Dr. Cloud sued his personal workers' compensation insurer, Hartford Accident and Indemnity Company.
Judgment was rendered awarding Dr. Cloud $265,816.86 against the State based on strict liability. The trial court allowed plaintiff to sue the State in tort finding that he was a public official and therefore excepted from coverage under the workers' compensation laws. The trial court also recognized Hartford's intervention for certain benefits paid plaintiff under the personal workers' compensation policy. Plaintiff's demands against Hartford for further benefits, as well as attorney fees and penalties, were rejected.
The State of Louisiana appeals. The plaintiff answered the appeal seeking an increase in the award of damages. Plaintiff also appeals the rejection of his claims against Hartford.
The first issue on appeal is whether Dr. Cloud was a public official or a public employee.
DR. CLOUD'S STATUS
When Dr. Cloud had the accident he was acting coroner for Rapides Parish. The accident happened on November 22, 1979, while he was exiting a building at Central Louisiana State Hospital after having seen some 15 or 20 patients there as part of his coroner duties.
The elected coroner of Rapides Parish was Dr. Ronald R. Tischler. In 1973 when plaintiff, Dr. Cloud, moved his practice to Alexandria, he entered into a relationship with Dr. Tischler which initially involved simply covering each other's calls in their private practice on alternate weekends. This relationship expanded over the years to the point that Dr. Cloud was also covering coroner calls for Dr. Tischler. Due to a number of circumstances and especially Dr. Tischler's failing health, the plaintiff began to do more and more of the coroner's work. From September 1979 until after the accident the elected coroner was hospitalized in Shreveport. During this period plaintiff performed all of the coroner's duties in Rapides Parish.
Dr. Cloud did not receive a salary. He was paid on a fee basis by Rapides Parish, presumably under the statutory fee schedule of LSA-R.S. 33:1558. Beginning in 1978, the coroner of Rapides Parish was required to examine patients committed from the 42 parishes of the State served by Central Louisiana State Hospital in Pineville; Dr. Cloud charged a commitment fee for each of these examinations. This is what he was doing the night of his accident. Income from his coroner-related medical practice is not separately stated on his 1979 income tax return, but is treated simply as part of his gross professional income.
Dr. Cloud was never administered an oath of office nor was he ever issued a commission. However, these are not valid tests of whether he was a public official because there are no statutory formalities involved in the commissioning of a deputy coroner. The testimony of both doctors indicated that Dr. Cloud had the authority from Dr. Tischler to act in his stead. Dr. Tischler wrote on a card and gave it to Dr. Cloud indicating that he had the power to act as coroner. Dr. Cloud was under the control of no one, not even Dr. Tischler, and he had the power to perform the duties of the office as he saw fit.
Under these factual circumstances the trial court concluded that Dr. Cloud was not an employee of the State or any political subdivision but rather that the doctor was a public official. Because of his status he could not sue the State under the workers' compensation laws but he could sue the State in tort. We agree with these conclusions for the following reasons.
LSA-R.S. 23:1034 provides workers' compensation benefits to public employees but excepts from coverage "an official of the state or a political subdivision thereof". The terms "public office" and "public officer" are statutorily defined by LSA-R.S. 42:1 as follows:

*1262 "As used in this title, the term `public office' means any state, district, parish or municipal office, elective or appointive, or any position as member on a board or commission, elective or appointive, when the office or position is established by the constitution or laws of this state.
"`Public officer' is any person holding a public office in this state."
The office of coroner is established by the Constitution. La.Const. of 1974, art. 5, § 29. The office of coroner is a State agency. Mullins v. State, 387 So.2d 1151 (La. 1980). The position of deputy or assistant coroner is authorized by statute. LSA-R.S. 33:1552[1] provides that any coroner may appoint deputy or assistant coroners to perform his duties and that they are to possess the same qualifications as the coroner. It appears certain that "official of the state or a political subdivision thereof" as used in R.S. 23:1034 means the same as "public officer" as used in R.S. 42:1.[2] Thus, both the coroner and a deputy coroner are public officials. The first is an office established by the Constitution and the second is a position authorized by the statutory law of the State.[3]
Deputy sheriffs have been found to be public officers of the State rather than employees, and as such, not covered by workers' compensation. Mitchell v. James, 182 So.2d 144 (La.App. 3 Cir.1966); Richardson v. Heyd, 278 So.2d 167 (La.App. 4 Cir.1973). When Phillips v. State, Through Department of Transportation, 400 So.2d 1091 (La. App. 1 Cir.1981), writ denied 401 So.2d 1195, writ not considered 403 So.2d 70, reached a contrary result, the Legislature promptly overruled it by amending R.S. 23:1034 to declare that sheriffs' deputies are appointed public officers and officials of their respective political subdivisions.[4]
Other cases on the subject have used various tests to distinguish between employees and public officials. When measured by these tests, deputy coroners come out looking like public officials. For example, a public official acts as agent of the State and exercises a portion of the sovereign power. Hyrhorchuk v. Smith, 390 So.2d 497 (La.1980); Courville v. Globe Indemnity Co., 63 So.2d 446 (La.App. 1 Cir. 1953). Another test is whether the office involves a large degree of independence and the public servant is not under the direct control and supervision of an employer. Hall v. City of Shreveport, 157 La.Ann. 589, 102 So. 680 (1925); Landry v. City of New Iberia, 223 So.2d 922 (La.App. 3 Cir.1969). A public official makes important policy decisions. Courville, supra. He has no contractual relationship with the State. In the case of McBeth v. Salvation Army, 314 So.2d 468 (La.App. 4 Cir.1975), the court stated: "Under our compensation law, the essence of the employer-employee relationship is a contractual hiring, either express or implied; in the absence of such a relationship, the law is not applicable". (See also Hall, supra; Jeansonne v. Parish of *1263 East Baton Rouge, 354 So.2d 619 (La.App. 1 Cir.1977); Malone and Johnson, Louisiana Workers' Compensation Law and Practice, § 51 (2nd Edition 1980)). A public official has to meet certain qualifications prescribed by law. Courville, supra. Clearly, Dr. Cloud's position meets these tests: he derived his authority from legislative enactment and exercised a portion of the sovereign power to the same extent as the Coroner himself; he was completely independent and not under the control or supervision of anyone, not even Dr. Tischler; he made important policy decisions, for example whether or not to commit a person to a mental hospital; he had no contractual relationship with the State; and he was statutorily required to have the same qualifications as the Coroner.
Based upon the above considerations we conclude, as did the trial judge, that plaintiff was a public official and, as such, excepted from coverage against the State under the workers' compensation laws, and that he could therefore sue the State in tort.
The next issue is whether the trial court was correct in finding the State strictly liable for Dr. Cloud's injuries.
THE STATE'S LIABILITY
The accident happened at about 11:30 on a rainy night. Dr. Cloud and his wife, who was assisting him on his rounds at the State Hospital, were leaving the building by the front door. Outside, Mrs. Cloud was using the umbrella and Dr. Cloud began descending the steps in front of her. At about the third or fourth step from the street level his feet went out from under him and he fell backward. Mrs. Cloud did not see her husband fall. In a deposition taken before trial, Dr. Cloud stated that the step on which he fell was slick from the rain. This is all we know about how the accident happened.
The building and steps were constructed in 1927. This was the main set of steps at the front door of the hospital. They were described as "monumental"[5] steps. Of concrete construction, the steps were approximately 20 feet wide between bulwarks on each side. There were 17 steps altogether. Between the top eight and the bottom nine there was a four or five foot wide plateau. There were no handrails. Although there were plenty of lights in the area, including two at the entrance doors and one on each of the two bulwarks, Mrs. Cloud testified that she did not think they were lit in the area where her husband fell. There was contrary evidence regarding the lighting.
The trial court concluded that the design and construction of these outside monumental steps, the absence of a handrail, the weather conditions and the lighting conditions, combined to create an unreasonable risk of injury. For these reasons the court awarded Dr. Cloud damages against the State based upon La.Civ.Code art. 2317.[6]
We find the trial court clearly wrong in these conclusions for reasons which we will now explain.
The elements of proof required to make out a case under article 2317 are:
(1) the thing which caused the damage was in the care or custody of the defendant;
(2) the thing had a vice or defect, that is, it occasioned the unreasonable risk of injury to another; and
(3) the injury was caused by the defect. Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980); Shipp v. City of Alexandria, 395 So.2d 727 (La.1981); Morgan v. Hartford Accident and Indemnity Co., 402 So.2d 640 (La.1981); Goodlow v. City of Alexandria, 407 So.2d 1305 (La.App. 3 Cir.1981); Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4 Cir.1981).
*1264 The essential factual determination is whether these steps presented an unreasonable risk of harm. To prove that they did, plaintiff relied on the testimony of Stephen R. Rosen, an expert in the biomechanics of stairstep fall accidents. It was this expert's opinion that the steps were unreasonably dangerous because of a three to four degree back to front slope of the stair treads and a variation of one-quarter inch between riser heights. According to Dr. Rosen, these two defects in combination with the rain caused plaintiff to fall backward in his descent.[7] Dr. Rosen did not know whether stairstep construction standards had been encoded as early as 1927. He could cite no modern code which prohibits or addresses the subject of inclines of outside tread construction. He correctly opined that a variation of one-quarter inch in riser heights is in violation of both the Southern Building Code and the Life Safety Code. He was under the mistaken impression that Louisiana had adopted only the Southern Building Code, which permits no variation. The Life Safety Code permits variations in riser heights of up to three-sixteenths inch. This expert felt that the presence of handrails will help break a fall and reduce injuries if the victim is within the "lunge range" of a handrail when he commences to fall. Dr. Rosen did not testify as to the effect, if any, of the lighting conditions, except to gratuitously comment that people walk down the stairs in their homes in darkness without falling. He also testified that the defects he measured in the daytime were "not easily perceivable to the eye".
Dr. Rosen did not explain the biomechanics of how the very slight slant in the tread levels caused the fall. All he said was that there was a slant and that in his opinion this was the main reason for the fall. He was mistaken in his conclusion that the riser height variations were in violation of the Life Safety Code: in this respect he was in error either in his measurements or in his arithmetic. Our calculation based on his measurements results in a variation of only one-eighth inch which is well within the tolerance permitted by the Life Safety Code.[8]
Betty Lee, an architect, testified as an expert for the State. She testified that the steps meet modern architectural principles and standards. She said she thought Louisiana had adopted the Life Safety Code[9] and that her measurements of the slight variations in tread heights revealed compliance with the code. Her explanation of the slight decline in tread levels which amounted to no more than one-quarter inch at the forward edge of the tread was that this design conformed to a long-established architectural practice of sloping the tread for drainage purposes. In her opinion the steps were quite safe.
Hospital officials testified that during the 13 years of their tenure there, no record existed of any slip and fall accidents on these steps.
Under these circumstances, we fail to see how these irregularities rise to the dimension of presenting an unreasonable risk of harm. Not only that, but we fail to see in the record proof that these slight *1265 imperfections were the cause in fact of the injury. The facts reveal only that measurements were taken somewhere on the lower nine of these wide steps, and that the plaintiff was somewhere on the third or fourth step when his feet went out from under him. The facts neither generally nor specifically relate the fall to the location of the imperfections. The instant facts are unlike those in Jones v. City of Baton Rouge, supra, where the defective manhole cover was clearly the cause of the fall into the manhole, and also unlike the facts in Shipp v. City of Alexandria, supra, where a slight imperfection in the street surface, though ultimately found not to be unreasonably dangerous, was nevertheless the probable cause in fact of the ensuing fall. A finding for the plaintiff herein would mean that any time there is a fall on stairs which can be found to have any measurable variation in riser heights or a measurable tread slant, strict liability is mandated. This would in effect make the State the insurer of anyone falling on steps of any of its numerous public buildings, for it is doubtful that any steps, old or new, are so perfectly constructed that minor imperfections cannot be found.
Since we have found that the plaintiff did not prove that the steps presented an unreasonable risk of injury, which is a fundamental element of proof required for either strict liability or negligence theories of recovery, we find that recovery cannot be allowed under either concept. For this reason we find it unnecessary to consider the State's contention that contributory negligence, though not pleaded, should be considered by us on appeal.[10]
For the above reasons, we conclude that the trial court was clearly wrong in finding liability and awarding damages against the State, and the judgment herein will be reversed.
PLAINTIFF'S PERSONAL WORKERS' COMPENSATION INSURANCE
The final issue is whether the trial court erred in failing to find Hartford Accident and Indemnity Company liable to plaintiff as his personal workers' compensation insurer.
There was in effect at the time of this accident a policy issued by Hartford to Dr. Cloud providing workers' compensation coverage within his duties as "PHYSICIAN & C". The policy also provided that the workman's compensation law of Louisiana was applicable.
Hartford initially paid the plaintiff $148 a week for 47 weeks ($6,956) in compensation benefits and paid $16,543.82 in medical expenses. These payments covered the period between November 22, 1979 and October 15, 1980, at which time the company terminated benefits under the policy. There is no evidence in the record as to what facts Hartford relied upon to discontinue benefits, nor did Hartford ever notify plaintiff as to why benefits were discontinued. We can surmise, based upon appellant's brief, that it was Hartford's position that Dr. Cloud was not within the course and scope of his duties as a physician but was acting in his official capacity as a deputy coroner.
We fail to see how this might constitute a reasonable basis for discontinuing benefits. Although we have found that the doctor was a public official at the time of his accident, that means only that he was not covered for workers' compensation benefits as a public employee by the State. At the time of his accident he was very much engaged in his profession as a physician. He did not cease being a physician just because he was seeing patients in connection with his official duties as deputy coroner. The law requires that a coroner and a deputy coroner be physicians.[11] The policy *1266 clearly covered all duties which related to Cloud's medical practice as a physician. Dr. Cloud's income derived from coroner-related duties was just another source of income from his practice of medicine. For these reasons we believe that Hartford was not justified in terminating benefits under its policy.
It is clear from the record that Dr. Cloud was totally and permanently disabled by his injuries and complications and was entitled to benefits in accordance with LSA-R.S. 23:1221(2). At the time of trial he was suffering from chronic osteomyelitis involving the right femur and a draining infection that made it dangerous for him to be around patients. It was felt that possibly he could resume limited practice in a year, perhaps longer, but due to the weakness in his legs it was doubtful that he would ever be able to handle his past workload.[12]
As to the issue of attorney's fees and penalties, whether the discontinuance of compensation payments is arbitrary, capricious or without probable cause depends primarily upon the facts existing and known to the insurer at the time payments were stopped. Such facts must justify the discontinuance. See Lee v. Smith, 248 La. 16, 176 So.2d 413 (La.1965); and Thibodeaux v. Dresser Industries, Inc., 407 So.2d 37 (La.App. 3 Cir.1981); writ denied 412 So.2d 85 (La.1982).
In the present case Hartford has offered no evidence as to the facts which it relied upon when it discontinued the benefits. The company also failed to notify the plaintiff of the reasons for such discontinuance. We can find from the record no facts to justify the discontinuance of benefits. Under these circumstances we find the termination of benefits was arbitrary and capricious and Hartford is therefore liable for penalties and attorney's fees. LSA-R.S. 23:1201.2.
We have reviewed the record in the case and conclude that an award of $4,000 for the attorney's services, including the trial and appeal involved in this matter, is appropriate. See Thibodeaux, supra.
The further award of 12% interest applies from the date on which benefits were terminated (October 15, 1980) until date that such back payments are made current.
For the reasons assigned, the judgment herein awarding plaintiff damages against the State of Louisiana is reversed. The judgment rejecting the demands of plaintiff against Hartford Accident and Indemnity Company is reversed, and judgment is rendered awarding weekly benefits at the rate of $148 from October 15, 1980 to September 11, 1982, together with 12% interest as a penalty from October 15, 1980, until the date the back payments are made current, and attorney's fees for services both at trial and on appeal in the amount of $4,000. The trial court judgment awarding Hartford's claims by way of intervention against the State is also reversed, and judgment is rendered rejecting the intervention. Costs both at the trial level and on appeal are assessed to Hartford Accident and Indemnity Company.
REVERSED AND RENDERED.
NOTES
[1] "Any coroner may appoint deputy or assistant coroners to perform his duties, they are to possess the same qualifications as the coroner, to be paid by the coroner appointing them, and the tenure of their appointment to continue for the length of time determined by the appointing coroner, but not longer than his own term of office, and the coroner shall be responsible for their acts. The coroner may appoint any necessary secretaries, stenographers, clerks, technicians, investigators, official photographer, or other helpers, and the fee or salaries of each and all of these to be paid by the coroner out of his fees, or by arrangement with the police jury if the coroner is on a salary basis, except parish of Orleans where fees or salaries are to be paid by the city of New Orleans."
[2] The Legislature in 1981 added language to R.S. 23:1034 to expressly so provide. See Act 25, Ex. Sess. of 1981.
[3] At first glance it might seem that the same reasoning applies to "secretaries, stenographers, clerks, technicians, investigators, official photographer, or other helpers", since R.S. 33:1552 (set out in footnote 1) also authorizes a coroner to appoint them. However, the statute appears to make a clear distinction between a deputy coroner who is to have the qualifications of the coroner and is empowered to perform his duties, and helpers who are merely employees because they lack the qualifications and authority of the coroner.
[4] Act 25, Ex. Sess. of 1981.
[5] Monumental steps have an aesthetic purpose. According to the State's expert, they are found on structures like the Louisiana State Capitol and the War Tower at LSU.
[6] "Art. 2317. Acts of others and of things in custody. We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
[7] The witness formulated this opinion on the day before trial. Previously, based upon measurements supplied to him by mail and his understanding that the plaintiff had fallen forward, he was prepared to testify that something having to do with the tread lengths caused the fall. On discovering the day before trial that plaintiff had fallen backward, the expert went to Central Hospital and took some measurements of his own. It was then that he came to the conclusion that the tread lengths had nothing to do with the accident but that the actual cause was a combination of the back to front decline of the tread levels and the variations in riser heights.
[8] Dr. Rosen said: "At this particular accident scene yesterday, on the nine risers on the side where Dr. Cloud fell, I got measurements of six point 0 inches (6.0), six point 0 (6.0), and all the rest were five and seven eights [sic] (5 7/8ths) inches. So there was a quarter inch (¼") difference going down."

The permissible variations apply from step to step, not cumulatively.
[9] She was correct. By Act 706 of 1975 (LSA-R.S. 40:1722), the Legislature adopted both the Southern Building Code and the Life Safety Code.
[10] The State argues on appeal that evidence was admitted at the trial without objection that plaintiff was a longtime user and heavily addicted to the morphine derivative drugs Dilaudid and Talwin and under the influence of these drugs at the time of the accident, as evidenced by the hospital records of Herman Hospital in Houston where he was taken after the accident, and also by the depositions of his two physicians there.
[11] Under LSA-R.S. 33:1556 the coroner of each parish shall be a licensed physician unless a licensed physician fails to accept the office. In the present case, both Dr. Tischler and Dr. Cloud were licensed physicians.
[12] At oral arguments plaintiff's counsel informed the court that Dr. Cloud died on September 11, 1982. A certificate of death was received by the court on ________. Therefore plaintiff is entitled to benefits from October 15, 1980 to September 11, 1982, and medical expenses incurred as a result of the accident after October 15, 1980.