462 So.2d 662 (1984)
STATE of Louisiana
v.
Russell HALTOM.
No. 84 KW 0218.
Court of Appeal of Louisiana, First Circuit.
November 29, 1984.
*663 Louis L. Sherman, Jr., Asst. Dist. Atty., Amite, for plaintiff State of La.
Joseph H. Simpson, Amite, for defendant Russell Haltom.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
On January 16, 1984, a Tangipahoa Parish grand jury indicted Russell Haltom, former Parish Road Superintendent and Personnel Manager, for three counts of malfeasance in office in violation of La.R.S. 14:134[1] by: "(1) authorizing the expenditures of $21,042.50 in police jury funds by contracting out dozer and trucking services for the Arcola Landfill without first putting this work out for bids; (2) awarding a contract to T.J. Delaune to do repair work on the Tangipahoa Parish Jail without first putting this project out for bids; and (3) authorizing the expenditure of $7,500.00 in police jury funds for repair of Parish tractors without first putting this repair project out for bids," all in violation of La.R.S. 38:2212, the public contracts law.
Defendant filed a motion for a bill of particulars seeking to discover which sections of the malfeasance and public bid statutes he was charged with violating, which Police Jury office he held making *664 him responsible for complying with the public bid law, whether the Police Jury had a particular compliance officer or a job description defining his position as that responsible for compliance, or whether the Police Jury, as a whole, bore the collective responsibility for compliance. The District Attorney responded that the defendant had violated Section 1 of the Malfeasance statute and Subsection A(1) of the public bid law[2] in his official positions of Road Superintendent and Personnel Manager, and in his unofficial role as Parish Manager, which duties could be found in the Public Affairs Research Council's (PAR) Police Jury Manual (not made a part of the record). In addition, the District Attorney replied that "any and all public officers and employees in positions of authority" were responsible for complying with the public bid statute, but, since the Police Jury as a whole had not been indicted, no answer was required about the Jury's collective responsibility.
Haltom filed two motions to quash the indictments, the first urging that the indictments fail to charge an offense punishable under a valid statute; and the second, that, as attorney for the Tangipahoa Parish Police Jury, the District Attorney's Office has a conflict of interest. Its attorney-client relationship with the Jury would be violated if the District Attorney or his staff either prosecuted or served as a witness against Haltom, a Jury employee. We granted defendant's application for writs of certiorari, prohibition and mandamus after his motions to quash were denied.

ISSUES
The issues are:
(1) At the Parish level, who is responsible for compliance with La.R.S. 38:2212?
(2) Can that responsibility for compliance with the public bid statute be delegated? If so, was it in fact delegated to Russell Haltom?
(3) Does La.R.S. 14:134 apply to Russell Haltom?

FACTS
On December 29, 1981, the Tangipahoa Police Jury voted 10 to 1 to appoint Russell Haltom Parish Road Superintendent and Personnel Manager effective January 1, 1982. Although the Police Jury formerly employed a Parish Manager, at that time it did not have one, nor was that title conveyed to Haltom. Haltom was an employee of the Police Jury for almost eight months, until his resignation August 10, 1982. (He had served as temporary Civil Defense Director for over two months.) Examination of the Police Jury minutes for that period (made part of the record) shows that the Police Jury regularly handled personnel matters through its Personnel Committee, with the Personnel Manager's recommendations occasionally noted. Recommendations about roads and other project expenditures were apparently funneled administratively through the Finance Committee, again with the Road Superintendent's comments and occasional recommendations noted. These two committees made recommendations which the whole Police Jury voted on, usually in advance of a decision, occasionally in ratification of Haltom's decisions.
The degree of authority which he was given varied. At a meeting on January 29, 1982, after a previously hired accountant was unable to take the job, the Jury decided to continue accepting applications, but told Haltom if he found a qualified employee to poll every juror before making a final *665 decision to hire, and the Jury would ratify his choice at the next meeting. At that same meeting, when Haltom discussed the possibility of hiring someone to assist with office typing and filing, the Jury took no action. The Police Jury "authorized" him to perform ministerial and some decision-making functions: from asking the District Attorney's office for legal opinions on maintaining bus turnarounds, to proceeding with an inventory of junk equipment for sale and using his judgment in State surplus auction equipment purchases, to hiring someone to cover the Arcola Landfill and make jail repairs. By June 8, the Finance Committee had recommended "that the Purchasing Agent be instructed not to issue any purchase orders over the amount of $25.00 unless approved by the Road Superintendent first, with this to be in effect until the audit of the Police Jury books is completed."
However, despite mounting critical financial problems, the Police Jury refused to affirm Haltom's June 29 termination letter to the Jail Project Coordinator even though the Jury had no funds to pursue building a new court-mandated jail following voter rejection of a jail bond election, and the Coordinator later admitted he was "sitting at home waiting for Mr. Ronnie Bankston, the Jury President, to call him and tell him he needs something done." The Police Jury was then (August 12) discussing whether to shut down most of its operations until the end of the year to "be in the black." The July 6 minutes record the reaction of Haltom, "who made known that he has to make day to day decisions all the time, and he does not appreciate it when the Jury does not back his actions."

I. RESPONSIBILITY FOR COMPLIANCE WITH PUBLIC CONTRACTS LAW
La.R.S. 38:2211 B provides:
B. Unless clearly indicated otherwise, compliance with this Part required of any public entity shall be done by the governing authority of such public entity if it has a governing authority.
La.R.S. 38:2211 A(1) provides the definition of "public entity":
A(1) "Public entity" means and includes the state of Louisiana, or any agency, board, commission, department or public corporation of the state, created by the constitution or statute or pursuant thereto, or any political subdivision of the state, including but not limited to, any political subdivision as defined in Section 44 of Article VI of the Louisiana Constitution, or any public officer whether or not an officer of a public corporation or political subdivision. "Public entity" shall not include a public body or officer where the particular transaction of the public body or officer is governed by the provisions of the model procurement code.
La.Const. art. VI, § 44, defines "political subdivision" and "governing authority:"
(2) "Political subdivision" means a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.
....
(4) "Governing authority" means the body which exercises the legislative functions of the political subdivision.

A. Public Officers and Employees
Although the 1974 Louisiana Constitution refers to both public officers of police juries and their employees as being members of the unclassified civil service, it fails to define what each includes. La. Const. art. X, § 2 B(10). It is well settled that parish police jurors are public officers and state officers. State v. Melerine, 236 La. 881, 109 So.2d 454 (1959). In State v. Smith, 357 So.2d 505, 507 (La.1978), the Louisiana Supreme Court devised four factors to aid in determining whether an entity is a state or public agency or an individual a state or public officer: "(1) the entity was created by the legislature, (2) the powers were specifically defined by the legislature, (3) the property of the entity belonged to the public, and (4) the entity's functions *666 were exclusively of a public character and performed solely for the public benefit."
A more recent case devises a test to determine whether an individual is a public official or employee, relying on La.R.S. 42:1 for a partial definition:
As used in this title, the term "public office" means any state, district, parish or municipal office, elective or appointive, or any position as member on a board or commission, elective or appointive, when the office or position is established by the constitution or laws of this state.
"Public officer" is any person holding a public office in this state.
If the individual acts as an agent of the state and exercises a portion of the sovereign power or if his office enjoys a large degree of independence in which he is not under the direct control and supervision of an employer, then he is a public official or officer. Cloud v. State, 420 So.2d 1259 (La.App. 3rd Cir.1982), writs denied, 423 So.2d 1166, 1167 (La.1982).
Looking at La.R.S. 38:2211 B in conjunction with the constitutional and statutory authorities cited, as the governing authority of Tangipahoa Parish, the Police Jury was required to comply with the public bid law. Even reading "public entity" to include a public body or officer, police jurors would be included, but not their employees.
This judicial definition of constitutional and statutory terms appears to coincide with the Tangipahoa Parish Police Jury's own view of its duties to comply with the Public Contracts Law. Examination of the Police Jury minutes for that almost eight-month period shows that although the body did not always advertise for bids every time it should have, when it did so, it followed a variety of "standard" procedures. Usually either the Finance Committee, the Purchasing Agent or the Parish engineer recommended that the Jury advertise for bids. Typically, the Jury then passed a motion "that the Jury advertise for bids" for a heavy duty dump truck, supplies, etc. Then, the advertisement always read, "Notice is hereby given that sealed bids will be received by the Tangipahoa Parish Police Jury...."
Rarely did Russell Haltom serve as the Jury's agent in the bidding process. Usually the engineers and architects, even on road projects, were the ones who recommended use of the bid process. Russell Haltom's name is mentioned in the minutes in connection with the bid process only four times: on April 13, the Jury bid notice designated him as its agent to receive bids and he recommended acceptance of the low bid; on June 8, he recommended that the bridge salvage job be bid "as is;" on July 6, he recommended acceptance of the highest bidder for junk it was selling; and on August 10 he read the bids received for a backhoe and trucks. Twice the Jury followed his recommendations on bids; twice it took no action or took the bids under advisement. During that same period, the Jury either discussed bidding or actually advertised for bids approximately 45 times.
Employing the Cloud test, was Russell Haltom a public officer or employee? We hold that he was an employee. The Police Jury derived its power from legislative enactment and exercised a portion of the sovereign power. Haltom derived his job from that legislative delegation of authority to the Jury which enabled it "to appoint all officers necessary to carry into execution the parish regulations, and remove them from office." La.R.S. 33:1236(10). Haltom was not completely independent, for he was under the control or supervision of the Police Jury. He had an employment contract with them and reported to them, even getting their permission in most policy decisions or following their directives. He was not statutorily required to have the same qualifications as jurors and was subject to removal at their will.
Nor did he fill the position of Parish Manager, established by La.R.S. 33:1236.1, formally or informally, even though he did sometimes perform duties outside those of Personnel Manager or Road Superintendent. *667 In fact, it is clear from the Police Jury minutes of March 29, 1982, that Parish accounts were being audited because of the accounting problems incurred as a result of the prior Parish Manager's poor business practices. Apparently, the Jury deliberately chose not to appoint another Parish Manager to succeed him.

B. Emergencies
La.R.S. 38 provides several exemptions from compliance with the public bid law procedure. The Legislature realized that emergencies may require quicker solutions than bid law compliance could allow. Therefore, section 2212 D permits emergency exceptions:
D. (1) This Section shall not apply in cases of extreme public emergency where such emergency has been certified to by the public entity and notice of such public emergency shall, within ten days thereof, be published in the official journal of the public entity proposing or declaring such public emergency.
and section 2211 A(6) defines "emergency" as:
(6) An "emergency" means an unforeseen mischance bringing with it destruction or injury of life or property or the imminent threat of such destruction or injury or as the result of an order from any judicial body to take any immediate action which requires construction or repairs absent compliance with the formalities of this Part, where the mischance or court order will not admit of the delay incident to advertising as provided in this Part.
There are no cases defining the terms and procedure of this section, nor is it clear from the minutes whether the Police Jury followed the statutory requirement of publishing public notices about emergencies. The Police Jury used a variety of methods in declaring three emergencies. On March 12 the Courthouse Committee Chairman reported estimates of "$16,183.00 plus tax from The Marley Cooling Tower Co. for tearing out and replacing the existing tower in the Courthouse Building" and "approximately $6,000" from Shepherd Service and Sales to repair the Courthouse chiller. A motion was passed to proceed with both repairs without public bid on an emergency basis "as summer is drawing near and it will take quite a long time to get the work finished." On April 13, after receiving no bids for a side cutter, the Jury passed a resolution authorizing and directing the "Purchasing Agent and Road Superintendent to purchase a hydraulic side cutter on an emergency basis" because "time is of the essence as it is time now to start cutting grass" and there was no assurance that re-advertising would guarantee any bids. Again, at that same meeting, without the prior formality of advertisement for bids or passing a resolution, the Jury simply voted to purchase a gradeall on an emergency basis, without designating an agent to make the purchase. On May 11, upon Haltom's recommendation, the Jury voted to pay for emergency repairs totaling $2,400.00 for labor (with the Wadesboro Baptist Church providing materials) to repair a church building to be used the following Saturday as a voting precinct.

C. Failure to Follow Bid Procedure
Despite the frequent presence of a legal advisor and the Police Jury's obvious familiarity with bid procedures, the Jury also authorized work or directed payments for projects or supplies where advertisement for bids was not discussed. Take, for example, the Jury's discussion of two landfill problems. On February 9 the Jury "advertised" for Parish property owners to offer their land as a landfill for solid waste disposal for ten years. On March 9 Haltom was asked to haul dirt to cover the Roseland Landfill in Arcola. The Sanitation Committee was to check into the future landfill use of holes already dug on Henry Jacobson's land. There was no mention of submission of bids in either case.
On March 18 Haltom informed the Jury that the last landfill hole was almost filled and, at the same time, presented a rental agreement with Jacobson for $700.00 a month, along with a public notice for the *668 Jury to apply for a temporary eighteen-month operating permit for the landfill. The rental agreement was signed by Cade Williams as Police Jury President and four witnesses, including the Secretary-Treasurer, two other jurors and Haltom. Barring future increases, this agreement could cost the Jury $8,400.00 annually, or potentially $84,000.00 for the total ten-year period sought in the February 9 Public Notice soliciting land owners wishing to lease land for a landfill. The terms of the contract are vague: if either a one- or ten-year lease, it exceeds bid exemption amounts; if a month-to-month lease, it may represent an attempt to circumvent the bid law. The Jury voted to ratify the contract.
On May 27 Police Jury President Cade Williams sought to clarify the intent of the March 9 motion relative to Arcola Landfill in Roseland since it "was not clear as to whether or not Mr. Haltom was to have Police Jury crews cover the landfill or hire someone to do the job." "Motion was made by Mr. Santangelo, seconded by Mr. Noto and carried that Mr. Haltom be authorized to hire someone to get the Arcola Landfill covered." Negotiation of the agreement with Jacobson, or how his land was selected, was not questioned, but Haltom was indicted on one count of malfeasance for contracting out dozer and trucking services for the Arcola landfill without first advertising for bids.
A special meeting of the Police Jury was called on July 15 to discuss several legal problems, including the report of the Courthouse Committee, with its suggestions for compliance with a July 6 Department of Health and Human Resources inspection report and a federal court consent decree mandating constitutional conditions for Tangipahoa jail prisoners. Haltom was asked by the President to review the violations and recommendations in the report. The minutes reflect:
After some discussion, whereby it was pointed out that making corrections such as these in the jail was a continuous, ongoing process in order to be in compliance with the consent decree, motion was made by Mr. Noto, seconded by Mr. Giardina and carried that Mr. Haltom be authorized to proceed with making the necessary corrections in the jail in order to comply with the report of the Department of Health & Human Resources.
Whether the Jury had intended to declare an emergency in order to comply timely with either the inspection report or the consent decree, no emergency was in fact declared, nor was there compliance with the public bid statute. By awarding a contract for jail repair without first advertising for bids, Haltom was indicted on a second count of malfeasance.
On other occasions the Police Jury took the following actions affirming the Finance Committee's recommendations. The first authorized the Purchasing Agent to issue a purchase order for $17,000.00 worth of repair parts for a wrecked Sanitation Department truck body. The second authorized the purchase from Felix Arnone of two separate orders of culverts, which added together would total $7,000.00.[3] The third authorized and approved "that the Road Superintendent look into the possibility of purchasing a bushhog to fit the tractor located at CD3; and if one is found, that it be paid from Ward 1 Maintenance funds." There was no mention of advertisement for bids in any of the three actions, nor was there when the Jury tailored a strict ordinance to fit only Acadian Ambulance Service, knowing it eliminated the local ambulance services from possible compliance and could cost the Jury $126,000.00.

II. DELEGATION OF AUTHORITY

A. Police Jury Powers
It is well settled that police juries are creatures and subordinate political subdivisions *669 of the State, possessing only powers conferred upon them by the State's constitution and statutes. Rollins Environmental Services of Louisiana, Inc. v. Iberville Parish Police Jury, 371 So.2d 1127, 1131 (La.1979). La.R.S. 33:1236 is the primary statute enumerating those powers which the police juries in this State have been granted. Under the authority granted in this statute in Section 1236(2), the police jury may make and repair roads, bridges and highways. Those limited police powers delegated by the Legislature to police juries are executed or enforced by them through passage of local ordinances and resolutions. "In doing so, they exercise only administrative powers." State v. Melerine, 109 So.2d at 469. Police juries may appoint all officers necessary to carry into execution the Parish regulations. La. R.S. 33:1236(10). However, whether they may further delegate their own powers to those employees is a separate issue.
Related issues are discussed in Lafourche Parish Water District No. 1 v. Carl Heck Engineers, Inc., 346 So.2d 769 (La.App. 1st Cir.1977), writ refused, 349 So.2d 873 (La.1977). This court found that the Legislature empowered the Police Jury to create water districts, delegating to these districts and their Board of Commissioners corporate control of limited water production and distribution. The Lafourche District contracted with an engineer to perform professional services "authorized" by the District, with District retention of review and approval of the engineer's work. Thus, no further subdelegation of discretionary power was made to the engineer by the Police Jury past the level of its Water District Board. In other words, the Board simply employed experts to carry out its duties. If the Jury was displeased with the Commissioners' decisions or felt they exceeded their authority, it could remove them. If any subdelegation occurred, the court found that maintenance of the waterworks system through assistance of professionals involved the delegation by the Board of a proprietary, not a governmental, function.[4]
Tangipahoa Police Jury minutes refer, for example, to a "Resolution granting (its) approval, consent and authority to Consolidated Gravity Drainage District No. 1 ... to conduct an election...." Similar mention of or appointments to other boards and districts are made: the Coastal Zone Board, to be the permit body of the Parish Coastal Zone; the Tangilena Airport Authority, Hospital Service District No. 1; and several Road Districts. In Notices of Special Elections for property taxes for Road Districts, the Jury referred to itself as the Road District's governing body. Although references are made to commissioners for some boards, there is no indication in the minutes that the Road Districts operate with Boards of Commissioners. Until the Louisiana Supreme Court declared the old ward system illegal, individual police jurors controlled road funds in their own wards. Strahan v. Fussell, 218 La. 682, 50 So.2d 805 (1951). Although individual voters in 1982 still brought road repair complaints to the juror in their districts in Tangipahoa, those problems were typically turned over to the Road Superintendent to check into or were the subject of Police Jury motions authorizing repairs.
Although in this case the Tangipahoa Road Districts may be distinguished from the Lafourche Parish Water Districts in operation, the principle on delegation of authority remains important. The Tangipahoa Police Jury served as the Road District's *670 governing body, using Haltom, an experienced contractor, as its expert employed to carry out its duties, retaining control over review and approval of his work after generally telling him what to do. The minutes use the term "authorize" liberally, whether in directing the Purchasing Agent to pay a small bill or giving the Road Superintendent limited discretion or telling him exactly what to do, so it is difficult to determine whether delegation of authority or simple permission to perform a nondiscretionary task is given. Examination of minutes for the whole period of Haltom's employment shows that the Jury generally directed his actions, sometimes ratifying them, but not hesitating to disagree with him on important occasions.
The Lafourche Parish Water District case seems to indicate that the Police Jury may delegate authority to quasi-corporations which it is legislatively mandated to create, but not to its employees. Tangipahoa's Police Jury apparently treated its Road Districts differently from other boards and special district. Minutes indicate the Jury directed orders to the Road Districts through the Road Superintendent.

B. Did the Jury Delegate Duties to Haltom?
Statutes are clearer in conferring powers upon police juries than they are on the delegation of those powers to policy jury employees. Even La.R.S. 33:1236.1, which grants police juries the power and authority to employ parish managers and assistant managers, provides only minimal legal qualifications for the job (they must be qualified voters in the Parish and may even be members of the Police Jury) but fails to discuss the delegation of authority issue. Using State v. Mays, 446 So.2d 1195 (La.1984), as an analogy, when the Legislature fails to define terms or roles, they may be defined by their exclusion from the act. In other words, if police juries possess only those powers delegated to them by the State Constitution and laws, then, absent specific legislative directive, police juries cannot delegate those duties to their employees. Their employees may, however, be necessary for execution or carrying out Police Jury decisions. Thus, the Jury may "delegate" daily bureaucratic details. Haltom's comments in the July 6 minutes indicating his frustration with the Police Jury's lack of support express that same viewpoint about his having to make "day to day decisions all the time."
Examining the factual situations in two of the three counts of malfeasance, the jail repairs and the landfill, it seems clear that the Police Jury directed Haltom to take actions but left the bureaucratic detail to him. This was especially obvious in the case of the Arcola landfill in Roseland, where its initial vague directive on March 9 for him to haul dirt to cover the landfill was corrected. On May 27, when Police Jury President Cade Williams offered the Jury a choice of using its own crews or hiring someone to do the job (without advertising for bids), the bid law was ignored when it need not have been. La.R.S. 38:2212 E(2) does not require bids when its own employees are used and 2212 A requires bids when others are hired instead.[5]
Therefore, the bid law had been ignored before Haltom was given the job of carrying out Jury directives, especially in light of the Jury's past emphasis on its role in advertising for bids on a regular, frequent basis and the fact that it had never delegated that responsibility before.
In the second count of malfeasance, as previously discussed, the Police Jury may have intended to declare an emergency to facilitate jail repairs for timely compliance with both the Department of Health and Human Resources inspection report and the federal court mandate. Its failure to do so, coupled with the additional omission of the bid process, created a legal problem. *671 It is clear from the July 14, 1982, minutes that the jail repairs were considered "continuous, ongoing" maintenance, but the indictment lacks clarity. Does the indictment, which mentions no cost, include both materials and labor? The State's brief indicates the total cost to be $36,300.00, well over the contract limit in La.R.S. 38:2212 A (see footnote 2) for public works. However, does the jail repair constitute a "public work"? This court has previously held that a "public work" means "a building, physical improvement, or other fixed construction." Lafourche Parish Water District No. 1, 346 So.2d at 778; Wallace Stevens, Inc. v. Lafourche Parish Hospital District # 3, 323 So.2d 794, 796 (La. 1975). It is not clear from the minutes or briefs whether the jail repairs encompassed a major renovation or regular maintenance. Replacement of fixtures and repairing leaks does not on the surface seem to be a major renovation. If regular maintenance, the work could fall under the exception in La.R.S. 38:2212 I:
I. This Section shall not apply to labor necessary for the maintenance of public works built and completed.
"The Public Bid Law applies only to the purchase of materials or supplies or the doing of public work." Lafourche Parish Water District No. 1, 346 So.2d at 780.
Each of these decisions was made by the Police Jury which directed Haltom to take the action it mandated. Of the 57 Louisiana malfeasance cases reviewed in researching the jurisprudence, not one involved a public employee. All of them were against public officials. Recently, where a sheriff instructed another public employee under his authority to withhold arrest and booking information from the District Attorney by removal of names from the booking log, the sheriff was charged as a principal with malfeasance, for the State contended in brief that the Chief Deputy removed the page at defendant's direction. State v. Coody, 448 So.2d 100, 103 (La.1984) (at note 6). A wildlife agent who instructed two other agents to act outside their authority in a trespass and false imprisonment case was liable for damages to the injured plaintiff, while the other two agents were considered "innocent victims" of his ill feeling toward the plaintiff. Guilbeau v. Tate, 94 So.2d 896 (La.App. 1st Cir.1957). It is well settled in Louisiana that "where a public official acts contrary to express statutory provision, such action is illegal." Courts have been willing to assess personal liability if the official is in bad faith. Godwin v. East Baton Rouge Parish, 372 So.2d 1060 (La. App. 1st Cir.1979), writ denied, 373 So.2d 527 (La.1979).
The third count of malfeasance, authorizing the expenditure of $7,500.00 for repair of tractors without advertising for bids, is discussed separately since it involves different legal issues. It is difficult to know whether this third count refers to the June 8, 1982, Police Jury motion accepting the Finance Committee's report authorizing and approving that the Road Superintendent look into the possible purchase of a bushhog to fit a tractor, or another transaction. The Police Jury minutes show an inconsistent use of terminology in describing tractors or tractor equipment, sometimes referring to particular brands, sometimes only to particular specifications, and sometimes interchangingly with other similar vehicles or road equipment. For example, the Police Jury authorized payment, repairs, or advertisement for bids for graders, dozers, tractor trucks, tractors, bushhogs, bushhog tractors, backhoes, lowboys, and in one case, a truck or a tractor. Out of the two dozen references to such equipment, most are either unambiguous or relatively so, but four authorizations could refer to the vague term "tractors" in the indictment.
Since the indictment used the plural of the word, the indictment could involve two or more tractors or transactions. Since most of these actions were taken as Jury votes to either follow Finance Committee recommendations to advertise for bids or approve expenditures by Jury agents, this third count of malfeasance could also involve the same delegation of duty issue as *672 the other two or an additional issue. If the indictment is so vague that the court is unable to pinpoint the exact transactions of defendant which are charged as violations of the law, then how can the defendant know enough to prepare a defense? Some of the transactions referred to in Jury minutes take place at different times in the almost eight-month period Haltom worked for the Police Jury. During that time, the Legislature had put into law two different versions of La.R.S. 38:2212 C. For the first part of 1982 until July 20, the 1978 version of 2212 C was operative. From July 20 until September 10, an amended 2212 C in Act 416 governed this issue.[6]
Although the District Attorney in the Bill of Particulars told the defendant he was charged with violating subsection A(1) of the public bid law, his brief discussed the Act 416 version of section C. This is another violation of the defendant's rights to due process under La. Const. art. I, § 13 and the Fifth Amendment of the U.S. Constitution. The defendant needs notice of the date(s) of the transaction(s) to know whether he must defend against possible improper cumulation of separate purchases, whether both labor and parts are included in the $7,500.00 total (bidding is required only for repair parts), and which version of the law applies.
La.C.Cr.P. art. 464 provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or *673 omission did not mislead the defendant to his prejudice.[7]
(Footnote ours.)
It is well settled that the essential purpose of the indictment or bill of information is "to inform the court so that evidence may be regulated, to inform the accused so that his defense can be prepared and to support a plea of former jeopardy in the event of another trial." State v. Glover, 262 La. 495, 263 So.2d 866, 869 (1972); State v. Scheuering, 226 La. 660, 76 So.2d 921, 924 (1954).

C. APPLICATION OF MALFEASANCE LAW TO HALTOM
This is apparently the first time an employee has been charged with malfeasance in office for obeying the collective decision of the Police Jury not to follow bid laws. Thus, this court is faced with a new issue under new versions of both the malfeasance and public bid statutes. In 1980 the Legislature amended La.R.S. 14:134 to include a new paragraph:
Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.
The additional paragraph gives new meaning to the key phrase in section 1 referring to the failure "to perform any duty lawfully required" of any public officer or public employee. Examination of the jurisprudence before and after this amendment shows very little change in interpretation of the applicability of the act.
To support a conviction under a charge of malfeasance, the Louisiana Supreme Court in State v. Melerine, 236 La. 929, 109 So.2d 471 (1959) (handed down the same day as the first Melerine case cited), said it was necessary to find that the defendants performed "the duties required of them in an unlawful manner." Thus, "it was necessary that the information describe the alleged conduct of defendants, and, state in what particulars, ... they had conducted themselves, so as to bring them within the statutory expression `unlawful manner.'" Melerine II, 109 So.2d at 478, 479. Police Jury President Melerine and Vice-President Licciardi, as public officers and members of the Board of Supervisors for Sewerage District No. 2, were found to have abused a mandatory duty to conform to the standards of conduct required in their oath of office. Melerine I, 109 So.2d at 469.
In 1980, the Supreme Court held that although the Real Estate Commission director intentionally issued licenses without valid testing of applicants, where statutes and Commission regulations failed to require of him an affirmative duty to administer fair and accurate testing procedures, his indictment failed to allege a criminal offense punishable under a valid statute. State v. Passman, 391 So.2d 1140 (La. 1980); La.R.S. 14:7. Similarly, State v. Mays found no statutory directive to equate the license applications falsified by the defendants with racing license applications, available only to those involved in actual conduct of racing. Although the defendants did falsify their applications, they were not involved in racing and, therefore, not covered by the criminal statute making it a crime to falsify only racing licenses. The Fourth Circuit upheld the *674 Passman requirement that malfeasance presupposes the existence of an affirmative duty, holding as a matter of law that no duty existed. State v. Perez, 450 So.2d 1324 (La.App. 4th Cir.1984).

CONCLUSIONS
All of the malfeasance cases cited tie the malfeasance charge to other criminal violations. Before amendment in 1979, public bid law violations incurred criminal penalties also. However, after that, only civil penalties can be imposed for violation of the act.[8] Because the malfeasance statute is a general one, it must be used in conjunction with another duty which the defendant is found to violate. In this case, Haltom was indicted for following the orders of the Tangipahoa Parish Police Jury. The Jury, not Haltom, was the entity required to comply with the public bid law. Whether that duty could have been delegated to Haltom is questionable, absent legislative directive, but whether they even attempted to delegate that duty must be answered in the negative. In addition, the third indictment is too vague to meet the due process objectives. Therefore, Haltom's indictments should have been quashed. In State v. Marshall, 424 So.2d 423, 424 (La.App. 2nd Cir.1984), writ denied, 428 So.2d 475 (La.1983) where insufficient evidence was found to support a statutory violation, there was no failure to perform a duty required of him; therefore, the defendant could not be convicted of malfeasance. For similar reasons, since there was no delegation of the Police Jury's statutory duty to Haltom and the indictment failed for insufficiency of information, there could be no failure by him to perform a duty and therefore no violation of the malfeasance statute. It is unnecessary for us to discuss the issue Haltom presented in his second motion to quash relative to the attorney-client relationship.
For the foregoing reasons, the judgment of the trial court denying the first motion to quash these three indictments is reversed; that motion to quash is now sustained and defendant is hereby ordered discharged from bail.
REVERSED.
NOTES
[1] La.R.S. 14:134 provides:

"Malfeasance in office is committed when any public officer or public employee shall:
(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
(2) Intentionally perform any such duty in an unlawful manner; or
(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.
Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.
Whoever commits the crime of malfeasance in office shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars or both."
[2] La.R.S. 38:2212 provides in pertinent part:

"A. (1)(a) All public work exceeding the contract limit as defined herein, including labor, and materials, and all purchases of materials or supplies exceeding the sum of five thousand dollars to be paid out of public funds, to be done by a public entity shall be advertised and let by contract to the lowest responsible bidder who had bid according to the contract, plans, and specifications as advertised, and no such public work shall be done and no such purchase shall be made except as provided in this Part.
....
(f) The term `contract limit' as used herein, shall be equal to the sum of thirty thousand dollars per project for the calendar year 1982 and, for each succeeding calendar year, shall be increased by a factor equal to three percent per year for each of the next ten calendar years."
[3] La.R.S. 38:2212 H provides:

"H. Under no circumstances shall there be a division or separation of any public work project into smaller projects which division or separation would have the effect of avoiding the requirement that public work be advertised and let by contract to the lowest responsible bidder as provided in this Section."
[4] Black's Law Dictionary, 1097 (5th ed. 1979), defines proprietary functions as those which government may perform when considered to be for the best interests of its citizens, for the entity's general betterment and improvement. The term usually applies to municipal corporations acting in a commercial or quasi-private capacity as with the Water District. The term was frequently used in Louisiana jurisprudence until Wex Malone pointed out its uselessness in distinguishing public employers from their employees. "Many employees are hired to discharge purely governmental functions of their public employer, while many of the highest city officials may determine policy for the proprietary activities of the corporation they serve." Wex S. Malone and H. Alston Johnson, Workers' Compensation Law and Practice, § 98 in 13 Louisiana Civil Law Treatise 220 (1980).
[5] La.R.S. 38:2212 E(2) provides:

"(2) The provisions of this Section shall not prevent municipalities or other public bodies from maintaining municipally owned and operated public utilities and other public properties with their own regular maintenance employees, however, not to include the construction of buildings. (Emphasis added.)
[6] Until July 20, 1982, Act 670 of 1978 governed. That version of 2212 C provided:

"C. Contracts for public works aggregating less than ten thousand dollars, and contracts for materials and supplies aggregating less than two thousand five hundred dollars shall not be advertised unless the public entity deems it advisable."
Act 416 of 1982 amended 2212 C to provide:
"C. (1) Contracts for public works aggregating less than ten thousand dollars shall not be required to be advertised unless the public entity deems it advisable. Purchases of materials and supplies not exceeding five thousand dollars shall be made in accordance with the small purchase procedures and minimum competitive requirements provided for herein.
"(2) All public entities shall, at a minimum, abide by the following procedures and requirements for purchases of materials and supplies not exceeding five thousand dollars, except that procurement requirements shall not be artificially divided so as to constitute a small purchase:
"(a) Purchases under five hundred dollars shall require no competitive bidding.
"(b) Purchases of five hundred dollars or more but less than fifteen hundred dollars shall be made by receiving written price quotations whenever time permits or, if time does not permit, telephone and telegraph quotations may be obtained and purchases made on the basis of the lowest quotation received. A written determination of why time did not permit written quotations shall be required.
"(c) Purchases of fifteen hundred dollars or more but less than three thousand dollars shall be made by soliciting written quotations from at least five bona fide prospective bidders.
"(d) Purchases of three thousand dollars or more but less than five thousand dollars shall be made by sending out written invitations for bids to at least five bona fide qualified bidders. Additionally, the public entity may advertise, at its discretion. Written invitations for bids shall contain complete specifications and the quantity required, and shall stipulate that bids will be publicly opened and read at a specific date and time, as well as other pertinent information, such as the delivery point and other information sufficient for a supplier to make an acceptable bid.
"(e) Purchases of parts and repairs for automobiles, machinery, and equipment shall be obtained either by the use of an authorized dealer for such items, as defined herein, or by obtaining competitive bids, as provided in this Section. An authorized dealer is defined as a dealer certified to perform maintenance and repairs by the manufacturer of a specific brand of equipment."
Act 691 was passed one day before Act 416, but the effective date for Act 416 was the date of the Governor's signature, July 20, while the effective date of Act 691 was omitted, making it effective September 10, with all acts not specifying effective dates. Act 691 contained a conflicting, apparently irreconcilable, version of 2212C from that in Act 416. To confuse matters further, the 1983 Legislature suspended Act 416 for 60 days to allow local governments time to adapt to the complicated small purchase procedure and then passed a greatly simplified version of Section C that same year, repealing both Acts 416 and 691.
[7] La.C.Cr.P. art. 464 amended the old version in La.C.Cr.P. art. 227 referred to in State v. Fitzgerald, 248 La. 487, 179 So.2d 906 (1965) and State v. Scheuering, 226 La. 660, 76 So.2d 921 (1954): "If the statute is one which defines an offense in general terms (malfeasance), use of the language of the statute is not sufficient, and the indictment must also state the specific acts of the defendant on which the charge is based." Malfeasance charges in those two cases passed constitutional muster for they specifically described conduct and circumstances upon which the charge was based in far greater detail than the third count against Haltom.

La.C.Cr.P. art. 227 provided, before amendment:
"The indictment must state every fact and circumstance necessary to constitute the offense, but it need do no more, and it is immaterial whether the language of the statute creating the offense, or words unequivocally conveying the meaning of the statute, be used.
[8] La.R.S. 38:2220 provided:

"A. Any purchase of materials or supplies or any contract entered into for the construction of public works, contrary to the provisions of this Part shall be null and void.
B. The district attorney in whose district a violation of this Part occurs, the attorney general or any interested party possessed a right of action to bring suit for appropriate injunctive relief in the district court to nullify a contract entered into in violation of this Part.
C. Where a judgment of nullity is rendered in any action brought by a district attorney or by the attorney general pursuant to Subsection B of this Section the district court may award a civil penalty not in excess of fifty thousand dollars against each offending member of the governing authority of the public entity who authorized the violation."
Repealing La.R.S. 38:2218:
"Any member of any governing authority violating the provisions of this Part shall be fined not less than fifty dollars nor more than five hundred dollars, or imprisoned for not more than thirty days, or both.